# CHARLESTON.

## POLING *et al. v.* FLANAGAN *et al.*

Submitted June 18, 1895—Decided Nov. 20, 1895.

1. SALE OF CHATTELS—DELIVERY OF POSSESSION—SUBSEQUENT PURCHASER.

   An absolute present sale of chattels is valid between the parties without delivery of possession or payment of the price ; and the seller is entitled to the price, the purchaser to the possession of the chattels. But as to subsequent purchasers without notice from the seller, or his creditors, the non-delivery of possession renders the sale *prima facie* void, as a matter of law, calling on the purchaser to show clearly the sale to be *bona fide;* but, if shown to be so, it is valid against such purchasers and creditors.

2. SALE OF CHATTELS—RETENTION OF INTEREST BY VENDOR.

   In a sale of chattels capable of delivery of possession, where there is no delivery of possession, if the seller retain any interest in the chattels, that fact, in connection with his retention of possession, renders the sale, not merely *prima facie* void, but absolutely void, as a matter of law, as to purchasers for value without notice and creditors of the seller. If the sale, though in form absolute, is really to secure a debt, and is thus a mortgage, the right of redemption is such an interest in the seller as, taken with his retention of possession, renders it so void.

3. BILL OF SALE—CHATTEL MORTGAGE—RECORDATION.

   A writing showing a sale of personalty need not be recorded ; but a mortgage or deed of trust of personalty must be recorded to bind purchasers without notice and creditors.

4. BILL OF SALE—CHATTEL MORTGAGE—RECORDATION.

   A writing importing an absolute sale of chattels, but in fact intended only to secure a debt, is a mortgage, and must be recorded as a mortgage of chattels to affect creditors and purchasers without notice, but, if recorded, it will bind them.

5. ATTACHMENT—LEVY—LIEN.

   An attachment from a justice's court or a circuit court creates a lien on leviable chattels only from its levy.

6. ATTACHMENT—LEVY.

   To make a valid levy of an attachment upon chattels, the officer, though he need not physically seize or even touch them, must have them in his view and power, and do some act indicative of an intent to levy and of the act of levying, and, if the

chattels are of a nature to admit of it, must take them into his custody and control.

7. SALE OF CHATTELS—POSSESSION—LEVY OF ATTACHMENT.

Under a *bona fide* sale of chattels, though there is no delivery of possession at the time of sale, yet, if the purchaser gets possession of them before an attachment is levied, his title is good against the attachment.

8. Application of payments.

LIPSCOMB & LIPSCOMB and W. B. MAXWELL for plaintiffs in error, cited Starkie Ev. (s. p.) 797; 6 W. Va. 508; 18 W. Va. 299, 659; 20 W. Va. 46; 26 W. Va. 344, 455; 8 W. Va. 515; 10 W. Va. 507, 546, 560; 23 W. Va. 267; Drake, Attach. (6th Ed.) §§ 221, 222, 227, 256, 323; 2 Freeman, Exec. § 260; 1 Tucker (s. p.) 109; Jones, Mortgages, § 702.

DAYTON & DAYTON for defendants in error :

I.— *Unrecorded security for debt.*—Code, c. 74, s. 5; 28 W. Va. 744; 26 W. Va. 807; 17 W. Va. 242; 15 W. Va. 829; 12 W. Va. 98; 8 W. Va. 36.

II.— *Conditional sale void as to creditors if not recorded.*—33 W. Va. 293.

III.— *What constitutes sufficient levy.*—Hutchinson's W. Va. Treatise, p. 795, § 1155; 2 Tuckers Com. Book 3, c. 20, p 366; 1 Munf. 269; Freeman, Ex. §§ 260, 261, 262.

IV.— *Collateral attack.*—52 Mich. 260; Van Fleet, Col. Atck; p. 474, § 469; 38 W. Va. 596; 4 W. Va. 130; 10 W. Va. 10; 26 W. Va. 324.

BRANNON, JUDGE :

Poling Bros brought *detinue* against Flanagan and Wiley in the Circuit Court of Tucker county to recover certain horses and harness, and, upon a demurrer by defendants to the evidence, judgment was rendered for defendants.

Junkins sold the property in controversy by written contract or bill of sale to Poling Bros., and under this Poling Bros. claimed it; while the defendants defend under an attachment levied by Flanagan, as constable, in an action brought by Wiley, a creditor of Junkins.

The first question arising is whether the plaintiffs had title to the property, as, to maintain *detinue*, they must

have. *Robinson* v. *Woodford*, 37 W. Va. 377 (16 S. E. 602). This question is easily answered so far as it concerns Poling Bros. and Junkins; for Junkins made an absolute bill of sale, by which he sold, assigned, and transferred all his right, title, and interest in the property to Poling Bros. This surely passed title, without regard to delivery of possession; for where a vendor consents to sell, and the vendee consents to buy immediately a specific chattel, a sale is made passing title, and neither a delivery nor tender of the property, nor payment of price, is necessary to perfect the sale. *Chapman* v. *Campbell*, 13 Gratt. 105; *Morgan* v. *King*, 28 W. Va. 1; 3 Minor, Inst. 98. In such case the purchaser becomes at once entitled to the possession; the seller, to the price. The contract need not in this state be written, as we have not adopted the statute of Charles II, requiring, for a valid sale, the delivery of the chattels in whole or part, or something given and accepted in earnest or part payment. 3 Minor, Inst. 98. But, where the rights of creditors and purchasers enter into the matter, the question presents a different face. As the books generally state, something else becomes necessary. Outside of that statute, one would think that a complete contract made in good faith would be enough; but as possession implies ownership, and credit is extended on its faith, in most jurisdictions something else is required to protect the vendee's right against creditors of the vendor or second purchasers of the property, and that something else is delivery. This word "delivery" is employed in so many senses that we have to discriminate closely when we read the books to see in what sense it is used. What is a sufficient delivery of possession under statute or at common-law where delivery is required? Here the cases are as numerous as the stars in the sky, and confusion and chaos reign under them. It would be work endless, and at last obscure, to essay any discussion of them; nor is it necessary to decide a case under our law. With us a sale, if *bona fide*, is good without delivery, as below shown. Many of the decisions are under the English or other statutes requiring delivery of possession, and take their hue from such statutes, and are not here applicable; and in the maze it is hard to discriminate

and say just what ones are under such statutes. See full note to *Claflin* v. *Rosenberg*, 97 Am. Dec. 336; Newmark, Sales, § 247; *Stephens* v. *Gifford* (Pa. Sup.) 20 Atl. 542; note to *Renninger* v. *Spatz* (Pa. Sup.)' 15 Am. St. Rep. 692 (18 Atl. 405); Benj. Sales (6th Ed., by Bennett) 672. But no statute tests the question here. The rule that the retention of possession of a chattel by the seller after absolute sale is *per se* fraud—that is, conclusive evidence of fraud—rendering the sale void as to subsequent purchasers and creditors of the seller, does not prevail here, but it is *prima facie* evidence of fraud, and will overthrow the sale as to purchasers and creditors unless circumstances of good faith are shown by the purchaser. I am relieved of any discussion of the subject by the elaborate discussions in *Davis* v. *Turner*, 4 Gratt. 422, and *Bindley* v. *Martin*, 28 W. Va. 773. In the former case the doctrine of fraud *per se*, or that such retention of possession is conclusive evidence of fraud, is repudiated, and the rule laid down that the "retaining of possession of personal property by the vendor after an absolute sale is *prima facie* fraudulent, but the presumption may be rebutted by proof." In the case of *Bindley* v. *Martin*, *supra*, this doctrine is approved, but the syllabus is more elaborate, and is prudently warning to courts and juries in applying this doctrine to the prejudice of creditors. The same is *Curtin* v. *Isaacsen*, 36 W. Va. 391 (15 S. E. 171).

In this case the facts here pertinent are that Poling Bros. contracted with Junkins to buy all his merchantable lumber to the amount of two hundred thousand feet, and advanced him on the contract one thousand eight hundred dollars. Junkins diverted some car loads from the performance of this contract, by selling the lumber to others; and, when Poling Bros. called for their lumber, they found only eighty thousand feet to go on the contract. They demanded their money, when Junkins proposed to satisfy them by selling them anything he had, and it ended in the execution by Junkins of the said bill of sale, conveying to Poling Bros. some logs, lumber, mules, horses, and harness. Then Poling Bros. made a contract with Junkins for a certain amount of lumber and logs, and were to pay him

five dollars per thousand for lumber put on the railroad, to pay him for putting the lumber to the railroad, and in addition, let him have the horses and mules to get out the logs and put the lumber to the railroad. Junkins went on to execute this contract, and Poling Bros. paid him one thousand two hundred dollars after the bill of sale, and sold him or let him have back some of the animals; and, at the time of the levy of the attachment of Wiley on the property in controversy, there was a balance due Poling Bros. taking all the money they had furnished Junkins into account, of eight hundred and forty dollars, besides compensation for the teams. The property remained in the possession and use of Junkins. It is very evident from the evidence that the bill of sale, though simply such, passing the legal title, and silent as to any right of redemption was simply a security for the payment of money due Poling Bros., so intended by the parties, and therefore, in the view of equity, a mortgage, *McNeel's Ex'rs* v. *Auldridge*, 34 W. Va. 748, (12 S. E. 851); *Bird* v. *Wilkinson*, 4 Leigh, 266. If we view it only as a bill of sale, as it left some interest in Junkins, I rather think it would be, in the eye of the law, because of such continuing interest of Junkins and his retention of possession together, fraudulent as to Junkins' creditors, under the terms of the law as stated in *Bindley* v. *Martin*, 28 W. Va. 773. See opinions why it is such an interest as to affect the sale in *Gregory* v. *Perkins*, 4 Dev. 50, and *Curtin* v. *Isaacsen*, 36 W. Va. 391, 394 (15 S. E. 171) and per Tucker, J. in *Bird* v. *Wilkinson*, 4 Leigh, 274.

If this were the whole case, the property would be liable to the attachment, but another element intervenes, and that is the fact that the bill of sale was duly recorded 19th of June. A mere bill of sale is not required to be recorded, and if recorded, it is no constructive notice. The record of a writing of absolute sale of personal property has no effect; but section 4, chapter 74, Code, makes void deeds of trust or mortgages of both real estate and goods and chattels, as to purchasers and creditors, unless recorded. *Curtin* v. *Isaacsen*, 36 W. Va. 391 (15 S. E. 171.) We have, then, the question whether the recordation of this conveyance of goods and chattels absolute on its face, though intended as

a mortgage to secure a debt, has any effect as to purchasers and creditors. There is a difference of opinion here. In *Curtin* v. *Isaacsen*, 36 W. Va. 391 (15 S. E 171) were two papers, a bill of sale and a paper declaring it but a mortgage; and it was held that recording the bill of sale alone was ineffectual; but, if both had been recorded, they would have been good. That case does not decide this. There was in fact a second paper, which referred to and made part of it the bill of sale. The second paper was the true mortgage, and it was not recorded; or else both made the mortgage. I am confirmed in this view by the opinion by Chief Justice Ruffin of North Carolina in *Gregory* v. *Perkins*, 4 Dev. 50, saying that if the contract for redemption were in a second instrument (as in the Curtin Case) the objection to the recordation of the bill of sale alone would apply both at law and in equity, as both instruments make one deed, and both are capable of registration, and show the true transaction as fully when registered as if engrossed on the same paper, and registry of both, but not merely the bill of sale, would be good. Also so held in 50 Pa. St. 512, in *Edwards* v. *Trumbull*. As above stated, the question whether a bill of sale of chattels absolute on its face, but operating as a mortgage, can be recorded, has engendered a difference of opinion. No authority on the point was cited in *Curtin* v. *Isaacsen*, nor is there in this case. Something can be said on both sides of it. In *Bird* v. *Wilkinson*, 4 Leigh, 266, it was held that such a bill of sale must be taken, as intended as a mortgage, and, because not recorded, void; thus implying that it could be recorded. If anything is said in the case that because it has the form of an absolute conveyance, and no appearance of a mortgage, it is not recordable, I suggest that it is not so decided, and that it is illogical to hold in the same breath that it is void because a mortgage and not recorded, and that it can not be recorded, and if recorded it avails not, and would be just as void as if not recorded. This can not be. The same may be said of *Gregory* v. *Perkins*, 4 Dev. 50, holding such a sale bill void because not recorded, the judge falling into the solecism of saying at the same time that it can not be recorded. Same in *Dukes* v. *Jones*, 6 Jones (N. C.) 14. I take it as logical to

say that any instrument which is void because not record-ed must be recordable. But these cases, in their syllabi, expressive of the actual decision, do not so hold. The case of *Saunders* v. *Pepoon*, 4 Fla. 465, does. The cases of *Nicklin* v. *Spring Co.*, 11 Or. 406 (5 Pac. 51); *Shaw* v. *Wilshire*, 65 Me. 485; *Kuhn* v. *Graves*, 9 Iowa, 303; *Preston* v. *Southwick*, 42 Hun, 291; and *Harris* v. *Chaffee* (R. I.) 21 Atl. 104 —hold that such bill of sale may be recorded as a mort-gage, and that the record is notice to creditors and pur-chasers. Jones on Chattel Mortgages says upon these authorities: "A bill of sale absolute on its face, intended to operate as a mortgage, is within the statute making void a mortgage not recorded, in case the property be not de-livered to and retained by the mortgagee." I will add that the parties intended such a paper to operate as a mortgage, and the law says it shall so operate. Why not then, treat it in all respects, under the law, as a mortgage? You compel the creditor to claim under it as a mortgage, and why not give him the benefit of the registry, so he may be fair to creditors by giving them notice, and at the same time preserve his own rights?

My examination has led me to the conclusion that where, as in this state, no provision is made for recording a writ-ten sale of personalty, but a mortgage or deed of trust of personalty must be recorded, and as the courts hold an ab-solute bill of sale intended only as a security for a debt to be a mortgage, there is a right to so record it as a mort-gage, and its record is notice to creditors and purchasers. But what has this to do with the case? In my opinion, it decides it for the plaintiffs. The bill of sale was not void for fraud in fact, but only in law, for want of delivery of the property. But it reached the record; it became valid against creditors; and no valid levy of the attachment was made prior to the admission of the bill of sale to record. The attachment was in the officer's hands earlier; but an attachment is not, like an execution, a lien from the time it reaches the officer's hands, but only from actual levy. Our statutes do not give earlier lien to an attachment, whether from a justice or court. A court attachment's lien on personalty commences at levy by the letter of

Code, c. 106, s. 9; and, the justice's law fixing no time, the law applicable to leviable writs governs. Drake, Attachm. §§ 221, 224; 1 Am. & Eng. Enc. Law, 919; 1 Wade, Attachm. § 26.

But Wiley claims a levy made before the registry of the bill of sale. The constable received the attachment 19th June, and went to where the horses were, in a stable, and Junkins and Wiley were conferring. The constable was there to levy, but was told by Wiley to hold up, that he and Junkins had about arranged it, and not to levy, and he did not levy, did not even see the horses. Wiley said, if he and Junkins did not arrange their matters, he could then levy. The constable then left. Three hours afterwards, at Hendrick's, four miles from where the horses were, the constable met Junkins, and Junkins told him he could levy on them; that he had locked them in the stable at Dunbrack's; and then, at Hendrick's, four miles from the horses,' without ever having seen the horses, he made this levy indorsed on the attachment. To constitute an effectual levy, it is not essential that the officer shall make an actual seizure; so he have the goods in his power, and view them, suffices. Hutchinson's W. Va. Treatise, 795; 4 Minor, Inst. 920; 2 Tuck. Bl. Comm. 367. Where slaves were in the presence of the officer, and he declared he levied on them, and listed them, but did not touch them, but went off leaving them with the debtor, he promising to produce them on day of sale, it was held a good levy. *Bullitt's Ex'rs* v. *Winston*, 1 Munf. 270. The officer must have the property in his view and power. *Dorrier* v. *Masters*, 83 Va. 459 (2 S. E. 927). But the sheriff must do some act with fixed design to levy. He should assert his title under the writ. He must do enough to subject him to an action of trespass unless the writ defends him. 7 Am. & Eng. Enc. Law, 149; 1 Bart. Law Prac. 826. If he has not done enough for that, he has not interfered with defendant's property, nor invaded his rights, nor unlawfully detained them; in other words, has made no levy. The officer, in attaching personalty, must actually reduce it to possession, so far as, under the circumstances, can be done, though in doing so it is not necessary that any notoriety should be giv-

en to the act to make it effectual. What is an actual possession, sufficient to constitute an attachment levy, must depend on the nature and position of the property. In general it may be said that it should be such a custody as will enable the officer to retain and assert his power and control over the property, so that it can not be properly withdrawn, or taken by another, without his knowing it. Drake Attachm. § 256. Freeman on Executions (section 260) says: "In all cases there must be something more than a pen and ink levy. It is not sufficient that the officer merely makes an inventory of the property, and indorses the levy upon the writ. He must go where the property is. He must have it within view. It must be where he can exercise control over it. He must exercise, or assume to exercise, dominion, by virtue of his writ. He must do some act by reason of which he could be successfully prosecuted as a trespasser, if it were not for the protection of the writ. But, in order to make him responsible as a trespasser, it is not essential he should remove or touch the property. It is enough that having the property within view, and where he can control it, he does profess to levy and assume control of the property by virtue of the execution, and with the avowed purpose of holding the property to answer the exigencies of the writ; for one who, to that extent, assumes dominion over property, is a trespasser, unless justified by a valid writ. The levy ought to be notorious, not made in a manner to indicate an intention to keep it secret. In general, a secret levy must be held invalid against third persons. Generally, there must be a taking of the property into possession of the officer, and a divesting of the possession of the owner." The same tests govern a levy of an attachment and a *fieri facias*. Tried by these tests, it is apparent there was no levy. Not nearly so much was done by the constable to effect a levy as in *Wadsworth* v. *Miller*, 4 Gratt. 99, and it was held no levy. This levy is purely one of pen and ink, made four miles away from the property, when it was neither in the view nor power of the constable. He knew not where it was, or who had it, save from hearsay, nor whether dead or alive; and it could have been taken by any one without his knowledge, and he did nothing like a re-

duction of it to his possession. He did not see or touch it for days afterwards, but it remained in Junkins' possession; and the property was of a nature and kind readily reducible to actual possession.

There is another factor which is decisive in its operation against the defendants. This abortive levy dates the 19th of June. About 5th of July, Poling Bros., with Junkins' consent took actual possession of the horses, and were taking them home; and, when going with them along the highway, the constable Flanagan came up, seized them and took them out of the possession of Poling Bros., under the attachment. Here is an actual delivery of possession under the bill of sale by Junkins to Poling Bros., and here, let us say, is a good levy—the only one—under the attachment. This levy can not avail, because after both the recordation of the bill of sale and the delivery of possession under it. If that recordation were inefficacious, the first levy being inefficacious, the second would also be, because after the delivery of possession. "If an absolute bill of sale, fair in itself, be not accompanied by immediate possession, but possession is taken by the vendee before the rights of any creditor of the vendee attach, the sale is good against the vendor's creditors." *Sydnor* v. *Gee*, 4 Leigh, 535. So in *McKinley* v. *Ensell*, 2 Gratt. 323.

It is mentioned but not insisted on, that the plaintiff's debt had been paid by lumber furnished. But to get that lumber out under the new contract after the bill of sale, required money, and under that, as a new contract, Poling Bros. were to and did furnish one thousand and two hundred dollars, as required in justice, as well as by the terms of the contract; and the actual application made by the parties of the money furnished went to repay that, so that there was left on the debt due Poling Bros. more than eight hundred and forty dollars, as shown by the evidence without contradiction. Parties can make their application of payments, and, if the debtor does not, the creditor can. This one thousand and two hundred dollars was a part of the second contract, and to be first repaid, of course under credits coming from its partial performance. It was a payment on that very demand. And it was the least se-

cured, and, if the parties did not apply, the law will apply, to the debt least secured. 2 Tuck. Bl. Comm. 106; *Norris* v. *Beaty*, 6 W. Va. 477; *Buster* v. *Holland*, 27 W. Va. 510.

We reverse the judgment in favor of defendants, and render judgment for the plaintiffs upon the demurrer to evidence.