THE TILDESLEY COAL COMPANY

v.

AMERICAN FUEL CORPORATION, *et al.*

(No. 9921)

Submitted September 17, 1947.   Decided
November 11, 1947.

F. E. Parrack, Floyd Anderson, and R. Doyne Halbritter, for appellant.

Milford L. Gibson, Theron L. Caudle, Assistant Attorneys General of U. S., Sewell Key, A. F. Prescott, and

*Fred E. Youngman,* Special Assistants to U. S. Attorney General, *C. Lee Spillers,* U. S. Attorney, and *Howard Caplan,* Assistant U. S. Attorney, for appellees.

Fox, PRESIDENT:

The American Fuel Corporation was engaged in a strip coal mining operation in Preston County, West Virginia, and on the 18th day of August, 1942, the West Virginia Tractor and Equipment Company, a corporation, hereinafter designated as "Tractor Company," by a conditional sales contract, delivered to said American Fuel Corporation, hereinafter designated as "Fuel Corporation," a tractor and scraper at the price of $13,509.50, of which $3,359.50 was paid, and for the residue ten notes of $1,015.00 each, payable to the Tractor Company monthly, with interest, were executed by the purchaser. This contract was filed in the office of the Clerk of the County Court of Preston County on November 7, 1942. No question is raised as to the validity of this contract, the lien thereof, or its filing in due time. Under the provisions of Code, 40-3-5, it was filed before any liens had accrued, or had been filed, which in any wise affected the property involved in the said sale.

A number of payments were made on the notes mentioned above, but they were not made regularly, as required by the contract. In the meantime, the Fuel Corporation had become indebted to the Tractor Company for supplies and repairs; and, on September 13, 1943, in the Circuit Court of Monongalia County, the Tractor Company recovered a judgment against the Fuel Corporation for the sum of $1,835.00, and $15.00 costs, which judgment is alleged in the answer of the Tractor Company to have been docketed in Preston County on the _____ day of September, 1944, and execution issued thereon and recorded in the execution docket of said county, but there is no support for said allegation in the record.

In this situation, an agreement was reached between the Tractor Company and the Fuel Corporation some time prior to January 25, 1944, under which there was to be returned to the Tractor Company the scraper mentioned in

the conditional sales contract aforesaid, at the sum of $4,309.20, with the understanding, as contended by the Tractor Company, that its judgment against the Fuel Corporation should be paid, and the balance applied to the payment, in part, of past due notes mentioned in the conditional sales contract aforesaid, and said payment was so applied. This alleged understanding as to the application of the return price of the scraper and the application aforesaid is contested by the Fuel Corporation, on the contention that the entire sum agreed to be paid for the return of the scraper should have been applied on the conditional sales contract notes. The testimony and circumstances bearing on this proposition will be hereinafter discussed. Subsequent to this transaction, and on June 1, 1944, the Fuel Corporation made a payment to the Tractor Company in the sum of $750.00, to be applied on note No. 6, under the conditional sales contract, but which note had, in fact, theretofore been paid to the Tractor Company. This being true, the Tractor Company, on the theory that no effective direction as to the application of the payment had been made, applied said payment, first, to the settlement of a current account against the Fuel Corporation, amounting to $373.30, and the residue on the unpaid outstanding notes under the sales contract. The application of this payment is of material interest only in respect to the ascertainment of the amount due from the Fuel Corporation to the Tractor Company under the conditional sales contract aforesaid.

In the meantime plaintiff, hereinafter called the "Coal Company," had made a loan to the Fuel Corporation in the amount of $15,000.00, to be repaid at the rate of fifty cents a ton for each ton of coal mined by the Fuel Corporation. Later, by a so-called deed of trust, dated September 1, 1943, acknowledged September 11, 1943, and recorded in the office of the Clerk of the County Court of Preston County on September 22, 1943, the Fuel Corporation conveyed to the Coal Company certain personal property, including the tractor and scraper covered by the conditional sales contract in favor of the Tractor Com-

pany aforesaid. It will be noted that no trustee is named in this so-called deed of trust; and, also, that while the certification of the acknowledgment is made under the seal of the notary public, there is no memorandum as to the date of the expiration of her commission as such.

On February 15, 1944, the Fuel Corporation sold the property included in the so-called deed of trust, aforesaid, to the plaintiff, the Coal Company, and executed a bill of sale to the said Coal Company, which has not been recorded. On the same day the Coal Company sold the same property to the Fuel Corporation, under a conditional sales contract, at the price of $14,000.00, which sales contract was filed in the office of the Clerk of the County Court of Preston County on March 13, 1944. In view of the claims for taxes, filed by the State and Federal Governments, it is important to keep in mind the date when the conditional sales contract last aforesaid was made, and the date when it was filed in the Preston County Court Clerk's Office.

In the meantime, certain property taxes for the years 1944 and 1945, on the property of the Fuel Corporation involved in this suit, amounting, as of the date of the decree appealed from to $176.13; contributions in the amount of $1,589.16 assessed by the West Virginia Department of Unemployment Compensation; and taxes in the amount of $1,255.78 assessed by the State Tax Commissioner of West Virginia, had accrued at the date of the institution of this suit, and taxes in favor of the United States, through its Collector of Internal Revenue, originally aggregating $4,876.09, but somewhat reduced by payments and consisting of taxes assessed as victory taxes, withholding taxes, unemployment taxes, and capital stock taxes. These taxes were made up in separate years and had accrued at separate dates. The assessments of these taxes were filed in the office of the Collector of Internal Revenue of the District of West Virginia, on dates beginning September, 1942, and at succeeding dates to November 13, 1944, but none of these assessments was filed in the office of the Clerk of the County Court of Preston

County prior to April 15, 1944. On that date, and on succeeding dates up to December 15, 1944, the liens of these assessments were filed in said Clerk's office. It will be noted that none of said assessments was filed in said Clerk's office prior to the 13th day of March, 1944, when the conditional sales contract aforesaid from the Coal Company to the Fuel Corporation was filed in the office of the Clerk of the County Court of Preston County.

Judgments were recovered by various persons, and in various amounts, against the Fuel Corporation, but it is not considered necessary to go into detail as to these judgments, inasmuch as, so far as this record discloses, there is no property involved in this case out of which in any aspect thereof, they can be paid; for, as will be hereinafter noted, the property here involved was sold for the sum of $14,000.00, and claims, admittedly preferred, amount to much more than that sum.

In this situation, plaintiff, The Tildesley Coal Company, filed its bill at February rules, 1945, against the American Fuel Corporation and others, setting up the several transactions as hereinbefore stated and praying that "process may issue against all of the above named defendants, and that said defendants be required to come into this suit and assert claims they make in the premises, and that the plaintiff may have a decree fixing and determining its rights and settling all matters and differences between all of the parties hereto, and that the plaintiff may have such other and further relief, both general and special, as its cause merits, * * *." The property as to which the conflicting claims are made is specifically set up in the bill, and includes the tractor sold under the conditional sales contract, executed by the Tractor Company to the Fuel Corporation, on August 18, 1942, and covers other property not included in said sale. An answer was filed by the Tractor Company, setting up its claim, which it asserts amounted to $2,738.19 as of June 15, 1944. The cause was referred to a commissioner for the ascertainment of the liens of the various parties, and their priorities; and there was filed before the commissioner, not only

the claim of the Tractor Company, but the claims of the State and Federal Governments, and various other creditors. On the report of the commissioner and exceptions thereto, the court entered a decree dated August 5, 1946, by which there was decreed to the following named persons, firms and corporation, in the order of priority of payment hereinafter stated the following sums of money: West Virginia Tractor and Equipment Company, $2,422.47; Collector of Internal Revenue of the United States the following sums, $903.39, $1,037.13, $548.92, $517.34, $182.06, $648.37, and $719.86, aggregating $4,557.07; all of said sums being for withholding taxes except the sum of $517.34, designated as victory tax; West Virginia Department of Unemployment Compensation $1,589.16; State Tax Commissioner of West Virginia, $1,255.78; Sheriff of Preston County, 1944 and 1945 taxes, $101.56 and $74.57, aggregating $176.13; The Tildesley Coal Company $15,730.00, and $430.65; United States of America, employment taxes, $193.85; United States of America, employment taxes, $170.40; United States of America, capital stock taxes, $115.46; and then enters decrees in favor of other creditors, not necessary to detail.

Prior to this decree, the property involved in this suit had been sold, under an agreed order entered in the cause on July 11, 1945, and, after due notice, on the 25th day of July, 1945, at the price of $14,000.00, and purchased by the Coal Company, plaintiff herein. This sale was confirmed on August 30, 1945, and the special commissioner who made the sale was directed to retain the fund derived, therefrom until such time as the priority of the various liens had been determined, except that he was authorized to pay out of said fund the costs and expenses of sale, including his commissions. All of these proceedings with reference to said sale were by consent of the parties to this suit, and no question is raised as to the validity thereof, nor is there any dispute that the liens decreed as aforesaid are liens on the proceeds of said sale.

From the decree aforesaid, we granted this appeal on December 16, 1946. It will be apparent that the cause will

have to be discussed and decided, first, with respect to the claim of West Virginia Tractor and Equipment Company, and, second, with respect to the priority for taxes contended for by the United States of America and the State of West Virginia, as against the claim of plaintiff under its conditional sales contract, dated February 15, 1944. The claim of the Tractor Company requires separate consideration and will be first determined.

No question is raised as to the priority of the Tractor Company's lien, the only question being that advanced by plaintiff, the Coal Company, in an effort to reduce the amount of the Tractor Company's lien. The effort to reduce this claim is based upon the application by the Tractor Company, first, of the payment made on account of the return, prior to January 25, 1944, of the scraper mentioned above, and, second, the application of the $750.00 payment made on June 1, 1944.

There is some dispute as to the proper application of the sum of $4,309.20, the agreed price for the scraper returned. Evidence was taken on this point, and it was stated by the official who handled the transaction for the Tractor Company, that it was agreed between his company and the Fuel Corporation, as a condition of the return transaction, that the judgment of $1,835.00, with interest and costs, should be paid in full; and the balance of the agreed price for the scraper should be applied on the unpaid notes then due under the conditional sales contract of August 18, 1942. The president of the Fuel Corporation says that the Tractor Company was directed to apply the whole of this sum on the notes; but he does not furnish any written evidence of this direction. Immediately after the application was made, by letter dated January 25, 1944, directed to Ernest H. Gilbert, president of the Fuel Corporation, the Tractor Company notified the Fuel Corporation of the application of the $4,309.20, and in that letter the state of the account is set forth as follows: Notes, $5,075.00; interest to January 20, (1944) $345.94; judgment, $1,835.00; interest, $39.15; court costs, $6.10, making a total of $7,301.19, less credit memorandum

of $4,309.20, leaving a balance due of $2,991.99, which is the sum the Tractor Company claims should have been decreed to it in this cause. There is no evidence that any exception was thereafter taken to this application, and the trial court held that the application so made by the Tractor Company was proper.

The ruling of the trial court on this point should be affirmed. It cannot be questioned that the general rule as to application of payments to existing indebtedness is correctly stated as follows: A debtor is entitled to direct the application of any payment made by him to any part of his indebtedness; where there is no direction as to application by the debtor, the creditor is entitled to make the application on any indebtedness in his favor; and where there has been no direction by the debtor, and no application by the creditor, a court will apply the payment to the indebtedness least secured. Here, of course, the Fuel Corporation had the right to direct the application of the credit agreed upon for the return of the scraper, and it claims to have done so. On the other hand, the Tractor Company claims that its application of this fund was proper not only because of its right to apply the credit where there had been no direction by the debtor therefor, but, also, on the theory that there was an agreement that it was to be so applied, first to the payment of its judgment, and the balance on the conditional sales contract notes. The letter written by the Tractor Company to the Fuel Corporation, immediately following this transaction, clearly outlined the manner in which the application had been made, and there being no subsequent objection to that application, leads us to believe that the proper application of this credit was made.

As to the credit of $750.00 made on June 1, 1944, it will be remembered that, at that time, the Tractor Company was the owner of a current account against the Fuel Corporation, amounting to $373.00. It is not questioned that the Fuel Corporation directed that the application of this payment be made to note No. 6, executed under the conditional sales contract between the parties, and that at that

date note No. 6 had been paid. We think, however, the direction made clearly indicated the intent of the debtor to have this payment applied to the indebtedness under the conditional sales contract, represented by notes. The error in directing its application to a note which had been theretofore paid, is not, in our opinion, of any consequence. The trial court held that the full amount of the $750.00 payment should be applied on the conditional sales contract notes, and we think this ruling should be affirmed. On these two rulings, the court determined that the Tractor Company was entitled to recover the sum of $2,422.47, with interest from March 1, 1946, and decreed that said sum had first priority as against the proceeds of sale of the tractor. There is a stipulation in the case that, for the purpose of priorities, the value of the tractor is $8,000.00. We affirm the decree of the Circuit Court of Preston County as to that part which determines the amount of the lien in favor of West Virginia Tractor and Equipment Company, and fixes its priority.

Next in order, is to determine the priority of the liens for taxes proved in the cause. There seems to be no dispute in the cause as against the amount of the decree in favor of plaintiff for $15,730.00. Plaintiff does not dispute the priority of the personal property taxes decreed to the Sheriff of Preston County, amounting in the aggregate to $176.13. It does dispute the priority of the liens for taxes decreed to the Collector of Internal Revenue of the United States, the Department of Unemployment Compensation of West Virginia, and the State Tax Commissioner of West Virginia.

We will first consider the claim in favor of the United States of America, on the several sums decreed to the Collector of Internal Revenue. The assertion of priority on the part of the United States of America is based, first on Sections 3670, 3671, and 3672, of the Internal Revenue Code. Section 3670 provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount or addition to such tax, together with any

costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." Section 3671 provides: "Unless another date is specifically fixed by law, the lien shall arise at the time the assessment list was received by the collector and shall continue until the liability for such amount is satisfied or becomes unenforceable by reason of lapse of time." But this lien, and the date it arises, are somewhat restricted by Section 3672, which under the heading "Validity against mortgagees, purchasers, and judgment creditors," provides: " (a) Such lien shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the collector (1) in the office in which the filing of such notice is authorized by the law of the State or Territory in which the property subject to the lien is situated, whenever the State or Territory has by law authorized the filing of such notice in an office within the State or Territory; or (2) in the office of the clerk of the United States district court for the judicial district in which the property subject to the lien is situated, whenever the State or Territory has not by law authorized the filing of such notice in an office within the State or Territory; or (3) in the office of the clerk of the District Court of the United States for the District of Columbia, if the property subject to the lien is situated in the District of Columbia."

By Section 1, Article 10, Chapter 38 of the Code of West Virginia, provision is made for the recordation of Federal tax liens, in the office of the clerk of the county court of each county in the State, so that the State of West Virginia has made provision for the filing of such notice, and the provisions of subsection (1) in the quotation above becomes applicable to the situation presented in this case. We do not understand counsel for the Government to contest this statement. They do insist, however, that tax liens in favor of the Federal Government become fixed at the time the statement of the assessment was received by the Collector of Internal Revenue, in the district where

taxpayer's business was being carried on; and in this contention we think they are correct. The receiving of the assessment list by the collector makes the lien effective, and serves, of course, to protect the lien so long as the rights of mortgagees, pledgees, purchasers or judgment creditors do not arise.

When, at any time, rights in favor of a mortgagee, pledgee, purchaser, or judgment creditor do arise, the mere receiving of the assessment list, in the office of the Collector of Internal Revenue, does not protect the lien, as against those persons, under the plain provisions of Section 3672 quoted above. It is entirely clear, that while some of these tax assessments were received in the collector's office, prior to the date of the bill of sale executed by the Fuel Corporation to plaintiff, none of them was filed in the office of the Clerk of the County Court of Preston County prior to the 15th day of April, 1944, more than a month after the filing of the conditional sales contract made by plaintiff Coal Company with the Fuel Corporation, and more than six weeks following the sale of the tractor involved herein by the Fuel Corporation to plaintiff, the Coal Company.

All this seems to be conceded, but counsel for the Government say that the plaintiff, the Coal Company, does not, under its mortgage, or under its bill of sale, or under its status as the seller in the conditional sales contract made by it to the Fuel Corporation, occupy the position of a mortgagee, pledgee, purchaser or judgment creditor. The argument for this proposition is: First, that the deed of trust dated September 1, 1943, was invalid, and did not create a lien against the tractor conveyed thereby, (1) because no trustee was named therein, and (2) because it was not properly acknowledged, in that the notary public did not certify the date of the expiration of her commission as such. We do not think either of these propositions can be sustained. It is fundamental law that equity will not permit a trust to fail for the want of a trustee. The writing herein considered is called a deed of trust, but is, in fact, a mortgage. Equity considers the

substance and not the form, and certainly the paper creates a lien on the property conveyed therein. The mere fact that it might be necessary to invoke the aid of a court of equity, to enforce the lien, does not detract from its force or effect. Quite frequently, trustees appointed in a trust deed die or become incapacitated, or, for other reasons, refuse to execute a trust. We have made provision under our statute for the appointment of a new trustee to enforce a deed of trust, by application to the circuit court of the county in which the property covered by the deed of trust is located. See *Machir* v. *Sehon,* 14 W. Va. 777; *New York Life Ins. Co.* v. *Kennedy,* (Va.) 135 S. E. 882.

On the point of the supposed invalid acknowledgment, the position of the Government that under Code, 29-4-8, the requirement that a notary shall state the date of the expiration of his commission is mandatory, and the failure to do so makes the acknowledgment invalid, cannot be sustained by reason or authority. It is quite evident that the purpose of the Legislature, in requiring a statement of the expiration date of the notary's commission was to make certain that, at the date of the acknowledgment, he was, in fact, a notary public. It specificially provides that a misstatement of such date shall not invalidate any official act of such notary, if his commission be, at the time thereof, in full force. We need not decide the question whether, in the absence of such statement of the expiration of the commission, and a showing that she was not at that time a notary public, would make the acknowledgment invalid. However, there is no showing here that the notary who certified the acknowledgment to the deed of trust, was not, in fact, a notary public with full power to act. We think, therefore, that the deed of trust or mortgage of September 1, 1943, was a valid instrument and created a lien on the property conveyed thereby. Whether such deed of trust, if the same had been attacked as a preference or as fraudulent, could have been sustained, is a question not now before us.

But the deed of trust, and the execution thereof, are not, in our opinion, of any particular importance in this

case. Even if the so-called trust deed had not been executed, the Fuel Corporation had the right to sell its interest in the property described therein, and it did so on February 15, 1944, when it executed to the Coal Company a bill of sale therefor. The fact that the deed of trust was in existence at that time, is not important. The plaintiff and the Fuel Corporation had a right to adjust their affairs to their satisfaction, so long as there was nothing fraudulent in the transaction, or any preference of creditors, and neither has been established in this case. No doubt the transaction of February 15, 1944, was intended to place plaintiff in what it thought was a more secure position, and the execution of the bill of sale to plaintiff, and the immediate resale of the tractor and other property to the Fuel Corporation, under a conditional sales contract, was intended to effect that purpose. Under ordinary circumstances, no exception could be taken by any person to such procedure.

But it is contended by the Government that none of these transactions constituted plaintiff, the Coal Company, a mortgagee, pledgee, purchaser or judgment creditor. Of course, it was neither a mortgagee nor a judgment creditor, and we do not think it was a pledgee; but, clearly, in our opinion, it was a purchaser, both under the deed of trust of September 1, 1943, and under the bill of sale dated February 15, 1944. Under the deed of trust, the tractor was conveyed to it and that constituted it a purchaser; and under the bill of sale it certainly became a purchaser of the property described therein. The fact that the bill of sale was not recorded is of no consequence. There may have been existing tax liens; but, if so, they had not been filed in Preston County when plaintiff acquired the interest of the Fuel Corporation in this property. It, therefore, took it free of any liens that might have then been in existence but not filed in said county, and it still holds an equitable interest in said property under its conditional sales contract with the Fuel Corporation.

Of course, at the date of these transactions, the legal title to the tractor involved in this cause was in the Tractor Company, under the conditional sales contract of August 18, 1942; but it must be borne in mind that, at that time, the indebtedness binding this tractor had been reduced to what we now hold was less than three thousand dollars. According to the letter of the Tractor Company to the Fuel Corporation dated January 25, 1944, it had been reduced to $2,991.99. Certainly, the Fuel Corporation was, at the date of its bill of sale to plaintiff, the beneficial owner of the tractor, subject only to the lien for the balance of the purchase money then due. The bill of sale, in our opinion, passed the beneficial ownership of the tractor to plaintiff, subject only to the Tractor Company's lien; and, in turn, when plaintiff by the conditional sales contract, delivered possession of the tractor to the Fuel Corporation, it transferred all its rights therein, subject only to the right to repossess the property in case of failure to pay the agreed purchase price therefor, and the superior lien of the Tractor Company. As stated above, equity considers the substance and not the form of a transaction. Unquestionably, by paying more than three-fourths of the purchase price of the property sold by the Tractor Company to the Fuel Corporation, in August, 1942, the latter acquired an equitable interest in the property, covered in the sales contract, which is transferable, and the transfer of which a court of equity will recognize.

But the Government contends further that under Section 3466 of the Revised Statutes of the United States, it is entitled to priority over all other indebtedness. This section reads: "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall first be satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an ab-

sconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed." This statute is very old. It rests on an act of March 3, 1797, and an act dated March 2, 1799. It seems to have been enacted because there is no common law of the United States, and the priority given by common law to debts due a sovereign state could not be claimed by the United States, but must depend for their priority on the statute. This was held in *Trust Co. v. Connecticut Brass & Mfg. Corp.*, 290 F. 712. The priority claimed must, therefore, rest entirely upon the terms of this statute, and by its terms it applies in case of insolvency, or whenever the estate of a deceased debtor is in the hands of an executor or administrator, and is insufficient to pay all the debts due from deceased. As to the case here presented, it could only be applied, in any event, where the insolvency of the debtor, in this case the Fuel Corporation, had been judicially established. There are indications in the record before us that the Fuel Corporation may be insolvent; but there is no proof of such insolvency, and it must be borne in mind that the bill in this case does not attempt to bring before the court all of the property of the Fuel Corporation, but it only brings into court, and asks for a determination of the liens, as to the property sold to the Fuel Corporation under the conditional sales contract of February 15, 1944. The amount of the Tractor Company's claim being in dispute, and the validity of the tax liens asserted by the Federal Government and the State of West Virginia, being in dispute, plaintiff sought to determine where it stood with respect to its indebtedness under its conditional sales contract with the Fuel Corporation. That is the extent of the property involved in this litigation. Whether the Fuel Corporation owns other property, out of which its indebtedness may be liquidated, is not clearly shown by this record. We are of opinion, therefore, that even if Section 3466 should be construed as securing priority in cases of insolvency, the section cannot be applied in this case.

But another question arises as to the applicability of Section 3466 to this case. There is respectable authority

for the proposition that the requirement of Section 3672 of the Internal Revenue Code, relating to the filing of tax liens should be applied to Section 3466 of the Revised Statutes. We have seen that the United States cannot, under its sovereign power, claim priority for unpaid taxes, over other liens against a taxpayer; but can only claim such priority under an Act of Congress; and the contention is that this being true, and Section 3672 having provided that such liens may not be enforced against mortgagees, pledgees, purchasers or judgment creditors, until notice thereof has been filed by the collector in the office of the state or territory in which any property affected by the lien is located, as therein provided, the same rule should apply to priority established by Section 3466 aforesaid. This theory is upheld in the case of *In re Meyers' Estate* (Pa.), 48 A. 2d 210. In that case the question is discussed at some length, and, were it necessary to do so, we would be inclined to give serious consideration to this aspect of the case. We do not do so, however, because we are of the opinion that the Federal Government has not brought itself within the provisions of Section 3466, in that it has not shown either insolvency, or the commission of an act of bankruptcy, on the part of the Fuel Corporation. Of course, there is here no question of an absconding, concealed, or absent debtor.

We are of the opinion, therefore, that the trial court erred in according priority to the Government of the United States, through its Collector of Internal Revenue, as against the claim of plaintiff. We do not think the Government protected its liens, by filing them in the office of the Clerk of the County Court of Preston County, at a date prior to that on which plaintiff became the purchaser of the property involved herein.

Nor do we think the State of West Virginia, through its Department of Unemployment Compensation, and its State Tax Commissioner, is entitled to the priority accorded them in the circuit court's decree. The lien of the decree to the State Tax Commissioner for the sum of $1,-255.78 is based upon Code, 11-13-12, which provides that:

"A tax due and unpaid under this article shall be a debt due the state. It shall be a personal obligation of the taxpayer and shall be a lien upon the property used in the business or occupation upon which such tax is imposed provided no such tax lien shall be enforceable against a purchaser (including lien creditor) for valuable consideration without notice, unless docketed in the office of the county court of the county wherein such property is located before deed therefor to such purchaser is delivered for record to the clerk of the county court of such county." The word "deed" should be construed to include a deed of trust, and we think a bill of sale of personalty. The assessment of taxes in this case was not at any time docketed in Preston County, as the statute requires, and this, we think, precludes the State from asserting its lien to the prejudice of the plaintiff, who is the purchaser of the property against which the lien is asserted. The deed of trust of September 1, 1943, was recorded in Preston County, and, as to the state taxes, certainly established plaintiff as the purchaser of the property conveyed thereby, which includes the property against which the State's tax lien is now asserted.

The situation with respect to the decree of $1,589.16 to the Department of Unemployment Compensation is somewhat different. Its claim is based on a priority provided for in the Unemployment Compensation Act, Section 18, Article 5, Chapter 1, Acts of the Legislature, Second Extraordinary Session, 1936, which provides: "In the event of any distribution of an employer's assets pursuant to an order of the court under a law of this State, payments then or thereafter due shall be paid in full prior to all other claims, except taxes and claims for wages * * *," thus creating a priority rather than, in direct terms, creating a lien. There is, so far as we know, no provision for filing an assessment for unemployment compensation in the office of the clerk of the county court, and therefore we do not need to consider that point in determining the priority of this particular claim. We do not think it can be asserted to the prejudice of the plaintiff, whose claim is

based upon a conditional sales contract, as to the property covered thereby, and the conditional sales contract of February 15, 1944, from the Coal Company to the Fuel Corporation covers all the property involved in this suit. In *Moran* v. *Leccony Smokeless Coal Co.,* 122 W. Va. 405, 10 S. E. 2d 578, we held: "The vendor in a conditional sales contract, duly filed, wherein title to the property sold is retained by him until the full payment of the purchase price therefor, is entitled to have paid any balance due him thereon before the payment of any lien which may attach thereto, except the lien of a levy for a property tax." In that case the State of West Virginia was claiming priority for a decree in its favor for gross sales tax and consumers' sales tax, but we think the principle announced must necessarily apply to a tax in favor of the Department of Unemplyoment Compensation. This theory is, as announced in the *Moran* case, that under a conditional sales contract the legislative intent was to tax only the property of the taxpayer, and that the section then under consideration should be interpreted to mean that the property upon which the lien was laid must be the property of the taxpayer, and that taxes could be imposed only upon the interest of a purchaser in a conditional sales contract, after the lien of the purchase money due the seller has been completely liquidated. Of course, applying that rule to this case, there must be full liquidation of the purchase money due before the priority of West Virginia can attach.

We therefore reverse the decree of the Circuit Court of Preston County, in so far as it grants priority to the claims of the Collector of Internal Revenue of the United States, the Department of Unemployment Compensation of West Virginia, and the State Tax Commissioner of West Virginia, over the claim of plaintiff, The Tildesley Coal Company, a corporation; and remand the case to said court, with directions to distribute the money in the hands of its special commissioner, applicable to the claims presented here as follows: First, the sum of $2,422.47 decreed to West Virginia Tractor and Equipment Company; second,

$176.13 decreed to the Sheriff of Preston County for taxes for the years 1944 and 1945; and, third to the decree of $15,730.00 in favor of the plaintiff herein. If it should develop, at any time hereafter, that any funds remain, after the payment of said sums, such remaining sum shall be first applied to the payment of the amount due to the Collector of Internal Revenue; and next to the decrees in favor of the Department of Unemployment Compensation and the State Tax Commissioner of West Virginia, in the order named.

*Affirmed in part; reversed in part; remanded with directions.*

KENNA, JUDGE, concurring:

Upon examination I find that the usual text statement to the effect that a notary's failure to state the date of the expiration of his commission does not invalidate a certificate of acknowledgment, ignores the wording of the statutes upon which the cases cited to sustain the text are based. See 1 Am. Jur. 358, 46 C. J. 520, John's American Notaries, 20. Our statute, Code, 29-4-8, is much more precise and rigid than any other I have been able to find, with the single exception of Oklahoma where the statute makes failure to comply a misdemeanor and is, of course, construed as mandatory. *Parks* v. *Lyons,* 183 Okla. 529, 83 P. 2d 573.

One of the cases commonly cited by text writers is that of *Kansas City & S. E. Ry. Co.* v. *Kansas City & S. W. Ry. Co.,* 129 Mo. 62, 31 S. W. 451. In that case the Supreme Court of Missouri was considering a deed executed by a corporation and, in passing upon what it termed "other minor objections to the several conveyances," had this to say: "The fact that a notary does not certify when his term will expire, or where he lives, does not, in the least, destroy the effectiveness of the deed to which he certifies an acknowledgment." It will be noted that the Court was dealing with "the effectiveness" of an instrument; not its recordability and the resultant constructive notice to

a third party. It will also be noted that the Court fails to cite the Missouri statute upon which its decision rested, the salient part of which reads as follows: "Every notary shall * * * designate in writing, in any certificate signed by him, the date of the expiration of his commission." Mo. Rev. St. (1889) Ch. 118, Sec. 7110. The Missouri statute involved required the date to be stated as a part of the certificate: not as a part of the official signature of the notary.

The Supreme Court of Nebraska held, in the case of *Sheridan County* v. *McKinney,* 79 Neb. 220, 112 N. W. 329, that under the applicable Nebraska statute the requirement that a notary's certificate state the date of his commission's expiration was mandatory, and that a certificate of acknowledgment not so signed was void. Upon a rehearing this decision was reversed and the acknowledgment held good due to the fact that the Court, upon reconsideration, concluded that the requirement was directory, not mandatory. 79 Neb. 223, 115 N. W. 548. An examination of the statute as fully quoted in the Court's first opinion will disclose that the Nebraska Court differed, not upon the question of whether compliance with a mandatory provision requiring a statement of the date of the commission's expiration was necessary to the validity of a notary's certificate, but upon the question of whether the provision under consideration was mandatory or merely directory, the statute in question reading as follows: "Each notary public, before performing any duties of his office, shall provide himself with an official seal, on which shall be engraved the words 'Notarial Seal' the name of the county for which he was appointed and commissioned, and the word 'Nebraska'; and in addition, at his option, his name and the date of expiration of his commission, or the initial letters of his name, with which seal by impression all his official acts as notary public shall be authenticated and under his official signature on all certificates of authentication made by him, such notary shall write the date at which his term of office, as such notary public, will expire. Provided, such date of expira-

tion is not engraved on the seal." The Supreme Court of Nebraska is committed to the rule that the absence of the official seal of a notary public required by statute to authenticate official acts of a notary renders those official acts void. *Welton* v. *Atkinson,* 55 Neb. 674, 76 N. W. 473, 70 Am. St. Rep. 416, and cases cited at page 675 of the official reports; *Byrd* v. *Cochran,* 39 Neb. 109, 58 N. W. 127. From the foregoing it will be seen that the Nebraska rule is that the failure of a notary public to comply with a mandatory statutory provision concerning his conduct in office renders void the attempted act.

The Kentucky case of *Harbour-Pitt Shoe Company* v. *Dixon,* 22 Ky. L. 1169, 60 S. W. 186, holds that a statement concerning the expiration of a notary's commission is not necessary to a valid notary's certificate. Here again the distinction is drawn between mandatory and directory statutory provisions. The opinion of the Court does not quote the statute nor does it assign definite reasons for considering the statutory requirement as directory only. However, the decision plainly rests upon the holding that the statutory provision is directory and not mandatory.

From the foregoing, which, as I said, covers all of the cases cited to sustain the texts above referred to, it is plainly seen that all courts recognize the fact that the failure of a notary public to comply with a mandatory statutory provision renders his official act void.

Our statute, Code, 29-4-8, reads as follows: *"The official signature of any notary* shall state the date of expiration of his commission, but a misstatement of such date shall not invalidate any official act of such notary, if his commission be at the time thereof in force." (Italics mine.) It is difficult to imagine a more mandatory provision than requiring it to be stated as a part of a notary's official signature. Plainly that means: with it a notary's certification is signed; without it a notary's certification is not signed. The act goes further and provides that a misstatement of the date shall not invalidate. Plainly, then, under the maxim of *expressio unius est exclusio alterius* an entire omission does invalidate.

Prior to the enactment of Chapter 46 of the Acts of 1909, notaries public in this State occupied their offices during good behavior, usually considered a life tenure. That act brought to an end all outstanding commissions on the thirty-first day of December, one thousand nine hundred and nine, excepting those commissioned since December thirty-first, one thousand nine hundred and three who continued in office for ten years from the date of their commission. By the terms of the act the Governor was authorized to commission notaries public for every county in the State for a term of ten years from the date of the commission. It is that act which includes what is now Code, 29-4-8, requiring as a part of the "official signature" of a notary public a statement, correct or incorrect, of the date upon which his commission will expire. I believe that the mandatory purpose of the statute could not be more clearly expressed and consequently that the official signature of a notary public is not attached to a certification the form of which is not accompanied by that statement. To speak of a required part of an official signature as a "memorandum," as the opinion of the majority does, is a misuse of words.

The discussion of the instrument dated September 1, 1943, and executed by American Fuel Corporation, transferring to the Tildesley Company the personal property here involved, marked "Plaintiff's Exhibit—Deed of Trust," beginning at the bottom of page 11 of the typewritten majority opinion, in my judgment is by no means clear. It expressly finds that the paper in question is a mortgage. Following that holding the Court states that equity will not permit a trust to fail for want of a trustee, and bases its second syllabus point upon that principle, which, to my mind, is inapplicable if the paper being considered is regarded as a mortgage.

Assuming, however, that it is a point of decision because embraced in the syllabus, I do not agree that equity will supply the name of an impartial person as trustee-grantee in a deed of trust which, at its execution and delivery, entirely omitted that essential element by under-

taking to name the creditor as trustee. There is a marked distinction between what we refer to as deeds of trust and the broad subject of equitable trusts in general. A deed of trust is a conveyance which speaks, as do deeds, at the time of its delivery. Then is when its validity *as a deed of trust* is to be determined. Here, although the term "trust deed" is used in the instrument there is no effort to vest title in a disinterested third party as trustee, which means that a named grantee is entirely lacking from the standpoint of creating a trust.

I have examined the authorities but have been able to find but one case resting upon the same statutory and equitable background existing in this jurisdiction. The Commonwealth of Virginia has that background and in the case of *Bank of Christianburg* v. *Evans,* 163 Va. 804, 178 S. E. 1, with a similar factual background and in principle turning upon the identical question here involved, in the third syllabus point their Supreme Court of Appeals had this to say:

> "The naming of a trustee, who is supposed to be an impartial and disinterested person, is essential to the nature and form of a deed of trust."

For the foregoing reasons, although I concur in the result, I dissent from Syllabus Point 4 and from the application of the principle stated in Syllabus Point 2. .

Judge Lovins wishes me to say that he agrees with this concurrence.