Preston County Coke Company

*v.*

Preston County Light And Power Company

(No. 12007)

Submitted September 13, 1960. Resubmitted October 18, 1960. Decided March 28, 1961. Dissenting Opinion April 24, 1961. Rehearing Denied May 9, 1961.

232

GIVEN, JUDGE, dissenting.

*Steptoe & Johnson, James M. Guiher, Charles V. Wehner,* for plaintiff in error.

*Charles H. Brown, Russell L. Furbee, Daniel Gersen,* New York City, for defendant in error.

HAYMOND, PRESIDENT:

This is an action of assumpsit instituted in the Circuit Court of Preston County April 22, 1958. The plaintiff, Preston County Coke Company, a corporation, herein designated as the coke company, seeks to recover from the defendant, Preston County Light and Power Company, a corporation, herein designated as the power company, the sum of $272,571.12, representing a balance of an open account between the parties which began about the year 1923 and continued until the institution of this action. This balance the plaintiff alleges the defendant owes and has refused to pay.

To the declaration, which contains three counts and with which the plaintiff filed two itemized statements of account, the defendant filed its statement of particulars of defense, its plea of nonassumpsit, its plea of the five year statute of limitations and its plea of payment; and to the plea of the statute of limitations the plaintiff filed its special replication in which it alleged that within that period the defendant in writing had acknowledged, and by a new promise had agreed to pay, its debt of $272,571.12. The defendant also asserted a claim of set-off consisting of three items aggregating approximately $26,000.00 against the plaintiff.

Upon the trial of the case the jury returned a verdict in favor of the plaintiff for $1304.43. On February 17, 1959, the circuit court overruled the motion of the plaintiff to set aside the verdict and grant it a new trial and rendered judgment in favor of the plaintiff for the amount of the verdict with interest and costs. By the same order the circuit court confirmed the finding of the jury in favor of the plaintiff upon the claim of set-off asserted by the defendant. To the final judgment this Court granted this writ of error upon the application of the plaintiff in which the plaintiff contends that it is entitled to a verdict for $272,571.12 instead of a verdict for $1304.43. The claim of the defendant of a set-off against the plaintiff is not involved in this writ of error.

The plaintiff was incorporated in 1907 and since shortly after its inception it has owned and operated a plant for the manufacture and sale of electricity and, until recently, coal and coke producing facilities in Preston County.

The defendant was incorporated in November 1923 and it acquired the ownership of an electric distribution system in Preston County by which it sells and distributes to the public generally electricity which it has, since its inception, purchased from the plaintiff.

The account here in suit which has been active and continuous during a period of approximately thirty five years before the institution of this action has resulted mainly from transactions involving the sale and purchase of electricity, although the plaintiff from time to time has furnished coal and coke and various other materials to the defendant, and the defendant, which also owns and operates a telephone system and an appliance store in Preston County, has furnished telephone service, electrical materials and supplies, and labor to the plaintiff. During a part of the period of the existence of the present account, in making its partial payments, the defendant deducted the amount of its invoices from the larger invoices sent to it by

the plaintiff and paid the plaintiff the amount of the difference. During the five year period, from April 1953 to April 1958, the total amount of the invoices, except three, rendered by the plaintiff to the defendant and charged against its account was $510,789.12. From that amount the defendant deducted $59,930.12 which represented the amount of the invoices rendered by it and charged against the plaintiff and paid the plaintiff, by checks of the defendant, the sum of $450,858.45. These two sums together equal the amount of the invoices rendered the defendant by the plaintiff during the foregoing five year period, except invoices for the months of April, May and June, 1953. From January 1, 1955 through April 1, 1958, however, any payments made by either party to the other were identical with the amounts of the current invoices without deduction; and during that period the plaintiff paid the defendant each month by check an amount which corresponded with amount of the invoice which the defendant transmitted to the plaintiff.

H. C. Greer controlled the management and the policies of each company from its inception until his death in 1948. The plaintiff and the defendant have always maintained separate offices, have kept separate books and bank accounts, and have made separate tax returns; and during most of the time each has had a separate bookkeeper. The office of the plaintiff has been located at Cascade and the office of the defendant has been located at Masontown, in Preston County. The distance between the two offices is about one mile. Until sometime in 1955 the same persons were officers in both companies.

After Greer's death, his widow, Mrs. H. C. Greer owned a majority of the stock in the coke company and during 1951 her daughter, then Jane Raese, now Jane Kelly, obtained control of the power company. On May 3, 1955 Jane and her then husband Dyke Raese were divorced and on May 6, 1955, she married H. B. Kelly in Florida. Several days later Raese resigned as president and director of the power company and on August

12, 1955, Jane Kelly became and still is its president and treasurer. On December 19, 1955, James C. Crane, whose employment by the power company began in August 1953, became and still is its vice president and since August 1955 he has been its comptroller. Since his election to those offices he has signed the checks that have been issued and delivered to the plaintiff.

A. W. Hawley, who was first employed by the plaintiff in 1908, has been its president since 1948 although he has not been active in its management after his retirement from his duties in 1953. He was also vice president of the power company from 1923 until the early part of 1954. From January 1939 through January 1950 all entries in the ledger sheets of the plantiff relating to its account with the defendant were in his handwriting and until April 1953 all checks issued by the defendant for payments to the plaintiff were signed by him as its vice president. H. W. Moore, who has been general manager and treasurer of the plaintiff since January 1, 1953, has been in charge of its office at Cascade and has had supervision of the work of its bookkeeper, Howard Burge; and from April 1953 until September 1955 Moore was authorized to sign and signed all checks issued by the defendant for payments on its account with the plaintiff. As the bookkeeper of the plaintiff, Burge has made the actual entries in its ledger in connection with its account with the defendant since February 1950. Until January 1953 he worked under the supervision of Hawley and, after Hawley's retirement, under the supervision of Moore.

Both parties concede that the amount of the balance of the account, when this action was instituted, was $272,571.12 and that no part of that amount has been paid to the plaintiff by the defendant.

In June 1954 Burge, the bookkeeper of the plaintiff, at the office of the defendant, compared the financial records of the plaintiff and the defendant with Crane, who was then the commercial manager of the defendant in charge of its books and records. At that time it was

determined between them that the only discrepancy concerning the account consisted of an item of $42.71 and an item of $59,856.62, representing the residue of an amount of $69,856.62 referred to as a ''charge off'' which on December 31, 1931 had been credited to the account of the defendant. Of that amount $10,000.00 was restored to the ledger of the plaintiff on December 31, 1942 and has been paid by the defendant. After crediting the defendant with $42.71 and adding the amount of $59,856.62 the balance owed by the defendant, as shown by the records of the plaintiff, was $294,601.66 as of June 30, 1954, and this exact amount is included as a debt of the defendant in its statement of the same date.

From April 30, 1955 until the institution of this action in April 1958, the plaintiff sent to the defendant monthly statements showing the balance owed by the defendant and the copies of the balance sheets of the defendant which, after February 1957, were sent each month to the plaintiff, carried the same amount as a debt it owed to the plaintiff. Each monthly statement sent to the defendant by the plaintiff during the foregoing period showed a balance of $272,571.12 owed by the defendant as of the date indicated on the statement. For example the statements show the balance of $272,571.12 as of April 15, May 13, June 22, July 13, August 12, September 16 and December 31, 1955; January 27, February 21, March 19, April 27, May 16, June 15, July 18, and December 14, 1956; January 31, February 26, March 22, April 18, May 31, June 30, July 31, August 22, September 27, October 18, November 29 and December 16, 1957; and January 14, February 18 and March 18, 1958. These monthly statements also show that payments made by the defendant during the period April 30, 1955 to the time of the institution of this action in April 1958, were credited to and applied by the plaintiff against the fluctuating monthly balance owed by the defendant according to the records of the plaintiff and that when the monthly charge against the defendant for March 1958 of

$8210.97 was paid on April 17, 1958, the balance which the defendant owed to the plaintiff at the time of the institution of this action was $272,571.12. The monthly balance sheets of the defendant for December 1957 and January, February and March 1958, also show its liability to the defendant to be $272,571.12.

In its annual verified reports to the public service commission the defendant listed as a liability to associated companies $272,571.12 as of December 31, 1957; $273,004.12 as of December 31, 1956; $283,207.39 as of December 31, 1955; $283,196.18 as of December 31, 1954; $292,098.03 as of December 31, 1953; and $291,594.04 as of December 31, 1952. These amounts represented or included the indebtedness of the defendant to the plaintiff as of the date indicated in each report. Since February 29, 1956, the indebtedness of the defendant to the plaintiff as shown by the ledger sheets of the defendant amounted to the sum of $272,571.12. The federal income tax return of the defendant for the calendar year 1957 stated that it owed the plaintiff the sum of $272,571.12. Jane Kelly testified that this balance of $272,571.12 was carried on the books of the defendant and included in its report to the public service commission because her mother Mrs. H. C. Greer told her that this was necessary to avoid tax difficulties. Mrs. Greer, however, denied this testimony of her daughter.

No representative of the defendant, at any time before the institution of this action, ever questioned or denied the amount of its indebtedness to the plaintiff, or challenged the correctness of any of the statements of the plaintiff concerning the account, or complained of the amount of the balance at any given time, or objected to the manner, in which the payments made by the defendant from time to time, and of which the defendant had full knowledge, were applied to or credited against the balance as indicated by the records of the defendant and by the monthly statements which the plaintiff sent to the defendant. Burge saw Crane almost daily while Burge was the bookkeeper of the

plaintiff, but Crane never, at any time, indicated to Burge that the defendant did not owe the balance of $272,571.12 or that "there was anything wrong with the account." In connection with a communication dated March 20, 1957, Moore, as general manager and treasurer of the plaintiff, informed Jane Kelly, then president of the defendant, that the amount owed by the defendant to the plaintiff on the account was $272,571.12. To this communication she never made any reply and she did not, at any time prior to the institution of this action, indicate by letter or other writing that the amount of the balance of the account was in any wise incorrect or that the defendant did not owe it to the plaintiff. On September 13, 1957, Mrs. H. C. Greer, vice president of the plaintiff, wrote Jane Kelly a letter to the effect that in order to provide capital necessary for its expansion program the plaintiff would be forced to proceed with the collection of the balance of $272,571.12. Neither Jane Kelly nor any other representative of the defendant ever replied to that letter or denied or objected to the amount of the balance of the account. At conferences held in Washington, D. C. and in Palm Beach, Florida, during the year 1955 which were attended by Jane Kelly and her husband and other representatives of the defendant, at which William C. McKee, who was then an officer of both the plaintiff and the defendant, was present, the account was discussed but neither Jane Kelly nor any representative of the defendant contended that the account in the amount of $272,571.12 was not a valid debt which the defendant owed to the plaintiff.

According to the statements of account, designated No. 1 and No. 2, and Exhibit No. 11, identified as Schedule 1-A, filed by the plaintiff, and testimony introduced in its behalf, the amount owed by the defendant at the time of the institution of this action was the sum of $272,571.12. The amount of its indebtedness as of June 1955, after crediting all payments upon the account made by the defendant, including the payments

made between that date and the date of the institution of this action was $539.33 and the addition to that amount of all the items charged against the defendant during the period July 1955 to March 31, 1958, constituted the balance of $272,571.12 at the time of the institution of this action.

From April 12, 1951 to August 8, 1952, the defendant made payments by eleven checks which were signed by A. W. Hawley, then its vice president. These checks exactly corresponded in amount with the net amount of the invoices sent by the plaintiff to the defendant and charged against its account. None of these checks contained any notation or was accompanied by any invoice, memorandum or statement which indicated or directed how the amount of each check should be applied in the payment of the account. Hawley testified that in signing these checks in behalf of the defendant he did not intend that any of them should be applied to the payment of any specific invoice or portion of the account and that all of them were applied as general credits against the account. He also testified that prior to 1951 other payments made by the defendant in specific amounts had, according to the established practice, been applied as general credits against the account, that the transactions between the plaintiff and the defendant in connection with the account were not conducted on a monthly basis, and that after the account began it continued for years before the defendant "paid anything much on the account." His testimony as to the application of these payments is not directly controverted by any evidence introduced by the defendant and their application as general payments is reflected by the books and the financial records of both the plaintiff and the defendant.

During the five year period, April 1953 to April 1958, immediately preceding the institution of this action, sixty four checks were issued by the defendant. Thirty one of these checks, issued between April 22, 1953 and August 11, 1955, were signed in behalf of the defendant by H. W. Moore as general manager. Moore

at the time was general manager and treasurer of the plaintiff. He was also an officer of the defendant who was authorized to sign its checks but he stated that he was not its general manager although that designation appeared below his signature. Twenty one of these checks, and in five instances two checks together, exactly corresponded in amount with the net amount of the invoices sent by the plaintiff to the defendant and charged against its account. Thirty three of the sixty four checks, issued between September 15, 1955 and April 16, 1958, were signed in behalf of the defendant by James C. Crane, its comptroller, and these checks also exactly corresponded in amount with the net amount of the invoices sent by the plaintiff to the defendant and charged against its account. None of the sixty four checks, however, contained any notation or was accompanied by any invoice, memorandum or statement which indicated or directed how the amount of each check should be applied in the payment of the account. Moore testified that the checks signed by him in behalf of the defendant did not pay and were not applied to the payment of any specific invoice or portion of the account and that all of the checks were applied as general credits upon the account. His testimony as to the application of the payments by the checks signed by him was likewise not directly controverted by any evidence introduced by the defendant and their application as general payments is reflected by the books and the financial records of both the plaintiff and the defendant. Crane testified that in signing the checks in behalf of the defendant he intended the amount of each of them to be applied against the invoices which corresponded in amount with the amount of each check, but he admitted that none of the checks contained any notation as to how the amount of the check should be applied. Burge, the bookkeeper of the plaintiff since February 1950, testified that the checks issued by the defendant as payments on the account were entered as general credits to the account and that this was done by him in accordance with his instructions from Hawley in March 1950.

With respect to the invoices of the plaintiff and the checks issued by the defendant during the five year period April 1953 to April 1958, except for the three months of April, May and June, 1953, the method employed was the transmittal of one copy of the invoice to the defendant, the retention of the other copy by the plaintiff, and the subsequent delivery to the plaintiff of the check of the defendant in an amount which corresponded exactly with the net amount of the invoice. The check contained no notation and was not accompanied by the copy of the invoice sent to the defendant or any memorandum or statement which designated the manner in which the amount of the check should be applied or credited to the account; but after the check had been paid and returned to the defendant it was attached to the defendant's copy of the invoice, placed in a folder, and filed with the records of the defendant.

For the three months of April, May and June, 1953, however, the defendant made no payments on the account. The invoices against the defendant for those three months aggregated $26,364.75. Between May 1953 and January 1955, eight payments aggregating $20,-000.00, which did not correspond in amount with the amount of any invoice issued by the plaintiff, were made by the defendant and were applied by the plaintiff as general credits against the account. The dates and the amounts of these eight payments were May 1953, $8000.00; August 1954, $2000.00; September 1954, $2000.00; October 1954, $2000.00; November 1954, $2000.00; December 1954, $2000.00; and January 1955, $2000.00. With respect to these payments Crane testified that he did not know what they were for except that the plaintiff was in the process of rebuilding its power plant and needed additional funds. The plaintiff contends that these eight payments were properly applied as general payments on the account. On the contrary the defendant insists that the aggregate of the payments of $20,000.00 together with a credit of $5060.25 to which it was entitled was in payment of the

aggregate amount of the invoices for April, May and June, 1953, except the sum of $1304.43, and that the verdict of the jury represented that amount as the only indebtedness of the defendant to the plaintiff.

A meeting of the directors of the defendant was held in Morgantown on December 16, 1952 which, according to the minutes, was attended by Jane Kelly, then Jane Raese, A. W. Hawley, Mrs. H. C. Greer and Dyke Raese. Raese was president of the defendant, Hawley was its vice president, Jane Kelly, then Jane Raese, was its secretary, and Mrs. Greer was its treasurer. The minutes show that the only business discussed or transacted at the meeting was the release by Mrs. Greer of notes of the defendant and certain accrued rentals in the amount of $28,989.88, which the power company owed Mrs. Greer personally. Jane Kelly testified that at that meeting Mrs. Greer told her that the plaintiff would forgive the balance of the account which the defendant owed the plaintiff and which at that time, according to the report of the defendant to the public service commission for the year 1952, was the sum of $291,497.97. She also testified that she reminded Mrs. Greer of this matter in a telephone conversation in June 1955 and again at a meeting held in Florida in May 1956. She did not state what, if anything, would accrue to the plaintiff in exchange for its action in cancelling or releasing the amount of the account. Raese, Hawley and Mrs. Greer testified positively that no such conversation or transaction relating to the account occurred in their presence at the meeting on December 16, 1952, and that they had never heard of any claim or contention made by the defendant that the account had been forgiven until after the institution of this action. McKee, who had been employed by both the plaintiff and the defendant, also testified that he was present at the Florida meeting in 1955 and that at that time, although the account was discussed, Jane Kelly did not at any time say that the account had been forgiven. The testimony of Jane Kelly concerning the forgiveness of the account was objected to by the plain-

tiff and it moved to strike it from the evidence. The circuit court, however, permitted that testimony to be introduced in evidence and instructed the jury on the question of the release of the account by the plaintiff.

On April 4, 1958, Moore by letter demanded payment of the account by the defendant in the amount of $272,571.12. The plaintiff received no reply to this demand and on April 22, 1958, it instituted this action to recover that amount from the defendant.

By its numerous assignments of error in the final judgment the plaintiff complains of the action of the circuit court (1) in overruling the motion of the plaintiff to set aside the verdict and grant it a new trial and in entering judgment in favor of the plaintiff for the sum of $1304.43 instead of the sum of $272,571.12; (2) in overruling the motion of the plaintiff, at the conclusion of the evidence, for a directed verdict in its favor for $272,571.12; (3) in refusing to give to the jury certain instructions offered, and a special interrogatory submitted, by the plaintiff; (4) in modifying, over the objection of the plaintiff, Instruction No. 6 offered by the plaintiff and in giving that instruction in its modified form; (5) in giving to the jury, over the objection of the plaintiff, certain instructions offered by the defendant; (6) in overruling the motion of the plaintiff to strike from the record all the testimony of Jane Kelly relating to forgiveness or release of the account which the plaintiff alleges the defendant owes the plaintiff in the amount of $272,571.12; (7) in excluding, over the objection of the plaintiff, certain evidence offered by it during the trial of the action; and (8) in admitting, over the objection of the plaintiff, certain evidence offered by the defendant during the trial of the action.

After the case was originally argued in this Court, it was reargued at the direction of this Court, particularly with respect to the controlling question whether the account asserted by the plaintiff or any part of it was barred by the five year statute of limi-

tations pleaded by the defendant, and the question of the alleged forgiveness or release of the account by the plaintiff.

Before considering the controlling question whether the account between the parties which was a single open and continuing account which began in 1923 and continued until, and even after, the institution of this action in April 1958, or any part of it, is barred by the statute of limitations, it is necessary to consider and dispose of several specific incidental or related contentions of the plaintiff on which it relies for reversal by this Court of the final judgment of the circuit court. These contentions are, in substance, (1) that the delivery by the defendant to the plaintiff of its monthly balance sheets, containing an express acknowledgment of the sum of $272,571.12 as a current liability which it owed to the plaintiff constituted a new promise within the meaning of Section 8, Article 2, Chapter 55, Code, 1931, which provides in part that if any person against whom the right of action shall have accrued on an award or a contract not in writing shall by writing signed by him or his agent promise payment of money on such award or contract, the person to whom the right shall have so accrued may maintain an action or suit for the moneys so promised within such number of years after such promise as it might originally have been maintained within on such award or contract, but that no promise, except by such writing, shall take any case out of the operation of Section 6, Article 2, Chapter 55, Code, 1931, or deprive any party of the benefit of such section, and that an acknowledgment in writing from which a promise of payment may be implied, shall be deemed to be such promise; (2) that the 1957 annual report of the defendant to the public service commission, listing the sum of $272,571.12 as a debt owing and payable to the plaintiff, alone and in combination with the delivery to the plaintiff of the December 1957 balance sheet of the defendant, on which its 1957 report was based, gave rise to such new promise; and (3) that the conduct of the parties in connec-

tion with the account consisting of their use at the end of the calendar year 1957 of the monthly statements of the balance furnished the defendant by the plaintiff and the balance sheets of the defendant and its 1957 annual report to the public service commission, all of which set forth at the same time the sum of $272,571.12 as the amount due and owing by the defendant to the plaintiff, created and constituted an account stated between the parties at that time and in that amount.

Contentions 1 and 2 are unsound for the reason that the designated balance sheets of the defendant which show the sum of $272,571.12 as a current liability of the defendant do not constitute a written signed promise to pay the plaintiff that amount of money or an acknowledgment from which such promise may be implied. The balance sheets and the annual report do, however, constitute an admission of its existing liability to the plaintiff in a designated sum. *Fayette Liquor Company v. Jones*, 75 W. Va. 119, 83 S. E. 726. The provisions of Section 8 of the statute expressly require a signed writing to constitute a new promise or an acknowledgment from which such promise may be implied and that such promise or acknowledgment be incorporated in a writing signed by the promisor or his agent. Though each balance sheet referred to contains the name or the title of the defendant in typed or printed form at the top of each written instrument, it is clear, from the evidence, that such use of such name or title was not intended to be, and did not constitute, the signature of the defendant. The annual report, though signed by the defendant, was never delivered to the plaintiff but instead was delivered to a stranger who was not a party to the account. To remove the account from the operation of the five year statute of limitations created and imposed by Section 6, Article 2, Chapter 55, Code, 1931, there must be an express promise to pay or, if there be a mere acknowledgment, it must be unqualified, without condition, importing liability and willingness to pay without reference to

a future settlement, and it must be determinate and unequivocal so as to be tantamount to an express promise to pay. *Hill v. Ringgold,* 112 W. Va. 374, 164 S. E. 412; *Griffith v. Adair,* 74 W. Va. 646, 82 S. E. 479; *Holley's Executor v. Curry,* 58 W. Va. 70, 51 S. E. 135; *Bank of Union v. Nickell, Admr.,* 57 W. Va. 57, 49 S. E. 1003; *Findley v. Cunningham,* 53 W. Va. 1, 44 S. E. 472; *Stansbury v. Stansbury's Adm'rs.,* 20 W. Va. 23; *Abrahams v. Swann,* 18 W. Va. 274. An acknowledgment in writing, to operate as a new promise to remove the bar of the statute of limitations, must be a clear and definite acknowledgment of a precise sum, importing a willingness and liability to pay; it must be an acknowledgment from which a promise of payment may be implied unconditionally and such as to indicate an actual liability and a willingness to pay. *Stiles v. Laurel Fork Oil and Coal Company,* 47 W. Va. 838, 35 S. E. 986. The foregoing documents prepared by the defendant expressly and unconditionally state an existing liability in a precise amount and may indicate willingness of the defendant to pay such amount; but the balance sheets do not constitute a promise or an acknowledgment in writing that has been signed by the defendant or its agent as expressly required by the statute, and the annual report, though signed by the defendant, was never delivered to the plaintiff or some person acting for it.

Contention 3, relating to the alleged account stated, is not well founded because the documents on which it is based, except the annual report, likewise lack the signature of the defendant. Though there is authority for the proposition that it is not necessary that an acknowledgment of the correctness of an account, in order to constitute an account stated, should be either in writing or made in express words, *Baltimore and Ohio Railroad Company v. Berkeley Springs and Potomac Railroad Company,* 168 Fed. 770, this Court has expressly held in point 4 of the syllabus in *Stiles v. Laurel Fork Oil and Coal Company,* 47 W. Va. 838, 35 S. E. 986, that ''A stated account, not signed by the

party, will not operate as an acknowledgment, to take a demand out of the statute of limitations." In the opinion in that case this Court said: "Another answer to the bar of the statute of limitations made by the corporation is that Stiles, in his lifetime, from time to time, rendered accounts to the company showing balances due from him as agent, which, as claimed, constituted stated accounts, and were acknowledgments and fresh promises of payment, and therefore repel the statute of limitations. I shall not consider the question whether these rendered accounts constitute stated accounts, because such discussion would be immaterial, since, if even they are stated accounts, they do not defeat the statute of limitations. They could not so operate in the teeth of the statute, which requires a promise or acknowledgment signed by the party in order to defeat the statute of limitations. 2 Wood, Lim. Act. Section 280." This Court will not depart from but instead adheres to and reaffirms its decision in the *Stiles* case that an account stated not signed by the proper party will not operate as an acknowledgment which will remove a demand from the application of the statute of limitations.

A promise sufficient to toll the statute of limitations should be made directly to the creditor or some person acting for him, and declarations or admissions to strangers are insufficient for that purpose. 12 Michie's Jurisprudence, Limitation of Actions, Section 60; *Layman v. Layman,* 171 Va. 317, 198 S. E. 923; *Dinguid v. Schoolfield,* 32 Gratt, 803, 73 Va. 803. The proof submitted by the plaintiff does not show that the annual report of the defendant to the public service commission or its 1957 income tax return was directed or delivered to the plaintiff or to any person acting for it.

This Court has held that a party who relies upon a new promise to remove the bar of the statute of limitations has the burden of proving such promise. *Bank of Union v. Nickell,* 57 W. Va. 57, 49 S. E. 1003; *Stansbury v. Stansbury's Adm'rs.,* 20 W. Va. 23. In *Stans-*

*bury v. Stansbury's Adm'rs.*, 20 W. Va. 23, the opinion contains this language: "The current of modern authority establishes, that the burden of removing the statutory bar rests upon the plaintiff. * * *". Though point 3 of the syllabus in that case states that "The burden of removing the bar of the statute of limitations by a new promise rests upon the defendants;" the word "defendants" manifestly is erroneously used for and actually means the word "plaintiffs"; for obviously a defendant who interposes the defense of the statute of limitations would not destroy such defense by attempting to establish a new promise to remove the bar of the statute on the application of which he bases that defense. The evidence in behalf of the plaintiff in this case manifestly does not satisfy or discharge the burden of proof imposed upon it on that issue.

On the decisive and controlling question whether the five year statute of limitations applies to and bars in whole or in part the demand of the plaintiff upon the open and continuous running account between the parties, the clear and decided preponderance of the evidence, much of which is not disputed or controverted by evidence introduced in behalf of the defendant, amply supports the contention of the plaintiff that no part of the account is barred by or subject to the application of the statute of limitations. The undisputed evidence shows that all of the payments made by the defendant from the inception of the account in 1923 until the institution of this action in April 1958 were without exception actually applied by the plaintiff, with full knowledge of and without objection by the defendant, as general credits upon the account.

Hawley, who as vice president of the defendant issued eleven checks during the period April 12, 1951 to August 8, 1952, testified positively that when he issued the checks they were not intended to be applied in payment of any specific amount and that all of them were intended to be and were actually applied as general credits against the account, and that the checks contained no notation or direction with respect to the

manner in which the amount of the checks should be applied. Moore, an officer of the defendant who was authorized to sign and did sign thirty one checks during the period April 21, 1953 to August 11, 1955, gave positive testimony to the same effect. Burge, who was the bookkeeper of the plaintiff from 1950 until the date of the institution of this action and kept its financial records, also testified positively that all payments made by the defendant were entered as general credits against the account, that Crane, vice president and comptroller of the defendant since 1955 and who signed thirty three of the checks issued by the defendant during the period September 15, 1955 to April 16, 1958, knew that these payments were applied as general credits to the account and, though he saw Burge almost daily during that time, he never at any time protested against or objected to the manner in which they were applied against the account.

In addition to the testimony of these witnesses the undisputed evidence shows that the monthly statements of the plaintiff which it delivered to the defendant and the balance sheets of the defendant which it delivered to the plaintiff, at least since January 1955, carried the same balance and showed that the various payments were applied to and credited against the balance of the account which fluctuated from time to time until March 1958, at which time the balance sheet of the defendant showed the balance which it owed to the plaintiff to be $272,571.12. The undisputed evidence also shows that the income tax return filed by the defendant for the year 1957 reported the liability of the defendant to the plaintiff in the amount of $272,571.12, that the annual reports of the defendant to the public service commission for the calendar years 1957, 1956, 1955, 1954, 1953 and 1952 listed its liability to "associated companies" in the sum of $272,571.12 or in an amount in excess of that sum, and that since February 29, 1956 the ledger sheets of the defendant showed it to be indebted to the plaintiff in the sum of $272,571.12. All the evidence, except the dubious testimony of Jane

Kelly who testified that the account had been forgiven in December 1952, is to the effect that the amount of the liability of the defendant to the plaintiff was the sum of $272,571.12, that no part of that amount has ever been paid to the plaintiff by the defendant, that no representative or officer of the defendant other than Jane Kelly, all of whom were familiar with the way in which the account was kept and handled, ever at any time prior to the institution of this action, objected to the manner in which the account was carried or to the manner in which the payments made by the defendant were entered as general credits against it, and that no representative or officer of the defendant, other than Jane Kelly, ever at any time prior to the institution of this action denied its liability to the plaintiff in the sum of $272,571.12 or refused to pay that amount to the plaintiff.

The only material evidence which in any way contradicts the above recited evidence in support of the contention of the plaintiff, or which gives rise to an inference contrary to that contention, consists of the testimony of Crane that in issuing the thirty one checks in amounts which corresponded with the amount of the monthly invoices during the period September 15, 1955 to April 16, 1958, it was his intention that the amounts of those checks should be applied to the payment of those invoices, although he admitted, in effect, that he never communicated such intention to any representative of the plaintiff, which is necessary to constitute a designation of the manner in which such payments should be applied, *Stone Company v. Rich,* 160 N. C. 161, 75 S. E. 1077, 1914C Ann. Cas. 247; 40 Am. Jur., Payments, Section 115; the evidence that during the period April 12, 1951 to August 8, 1952, the eleven checks issued by Hawley corresponded in amount with the invoices issued by the plaintiff during that period of time; the evidence that during the five year period April 22, 1953 to April 22, 1958, the date of the institution of this action, the sixty four checks issued by the defendant either singly or together cor-

responded in amount with the invoices of the plaintiff for fifty seven of the sixty months of that five year period; the evidence that, notwithstanding the larger indebtedness which the plaintiff claims was owing to it by the defendant, the plaintiff paid the amounts of the invoices which the defendant charged against the plaintiff during the period January 1, 1955 to the date of the institution of this action; the evidence that a letter from the plaintiff signed by Hawley as its secretary to the defendant, dated September 16, 1935, stated that in order to enable the plaintiff to meet its payrolls it would be necessary for the defendant "from now on," to pay to the plaintiff each month for the electricity which it sold the defendant and requested the defendant to pay the August charge for electricity by September 28 and in addition to pay as much as it could to the plaintiff; and the evidence of Jane Kelly to the effect that the account had been forgiven in 1952 and that the records of the defendant subsequently listed the balance of the account because Mrs. Greer told her that it would be necessary for the denfendant so to carry the balance to avoid tax difficulties.

The inference in favor of the defendant arising from the foregoing evidence in its behalf, however, is weakened by the lack of evidence to show that any checks which corresponded in amount with the invoices of the plaintiff were issued by the defendant between August 8, 1952 and April 22, 1953, by the failure of the defendant to issue any checks which equalled in amount the invoices of the plaintiff for the three months of April, May and June, 1953, which aggregated the sum of $26,364.75, by the issuance by the defendant between May 1953 and January 1955 of eight checks aggregating $20,000.00 which did not correspond in amount with the amount of any invoice of the plaintiff and by the actual application by the plaintiff, with knowledge of the defendant and without objection by it, of the payments made by these checks as general credits on the account.

The identity of the amounts of the invoices of the plaintiff and the checks of the defendant during the periods April 12, 1951 to August 8, 1952 and April 22, 1953 to April 16, 1958, and the action of the plaintiff in paying the invoices of the defendant during the period 1955 to 1958, instead of retaining and applying the amount of the invoices to the payment of the indebtedness of the defendant, do not constitute a clear or unequivocal indication of any direction by the defendant that the plaintiff should apply the amount of such checks to the payment of the invoices in like amounts, or that such checks should not be applied, as they actually were applied, as general credits against the account. In the light of the transactions between the plaintiff and the defendant, as shown by the evidence, it is not unreasonable to assume that because the defendant at various times was in need of financial assistance, which the plaintiff rendered on various occasions, it paid the invoices of the defendant in order to furnish the defendant such assistance, at least, during the period of the close and amicable association between them which continued until the change in the personnel of the officers and directors of the defendant during the year 1955. It is also not unreasonable to assume that if the defendant, even during the period of the close association between the plaintiff and the defendant, had actually directed the plaintiff to apply its payments to the credit of particular invoices or specific portions of the account, which it easily could have done, but obviously did not do, by a mere notation or memorandum to that effect, instead of permitting such payments to be applied as general credits against the account, it is most unlikely that the plaintiff would have postponed the institution of legal proceedings to enforce the collection of an admitted indebtedness of more than a quarter of a million dollars until the belated date of April 22, 1958.

The defendant cites and especially relies upon the case of *F. M. Slagle and Company v. Bushnell,* 70 S. D.

250, 16 N. W. 2d 914, in support of its contention that the identity in the amounts of its checks and the invoices of the plaintiff constituted a direction that the amounts of the checks should be applied by the plaintiff to the payment of such invoices. The material differences in the facts in that case from the established facts in this case readily distinguish these two cases. There the account existed for a period of approximately ten years before the institution of suit; here the account continued for a period of thirty five years. There the amount of the indebtedness was disputed; here the amount of the unpaid balance is admitted. There twenty six payments ranging from $1.10 to $75.65 were made during a six year statutory period before suit was instituted. There the largest payments were one for $75.65 and another for $54.20 and all of them were represented by the personal checks of the defendant who directly testified that the checks were in payment of current items. Here there is no such direct testimony. There the evidence did not disclose whether anything was said or written in connection with the delivery of any of the checks. Here the evidence is clear and undisputed that nothing was said or written by the defendant which directed the plaintiff to credit the amounts of the checks against the identical amounts of the invoices and, unlike the factual situation in the *Slagle* case, the undisputed evidence in the case at bar is that the plaintiff, with full knowledge of and without objection by the defendant, actually applied the checks as general credits against the account. Other material differences between the factual situation involved in the *Slagle* case and the factual situation here involved appear from the opinion in that case; and these differences will readily appear from even a casual consideration of that opinion. But even if there were no differences in the material facts of that case and of this case, the decision in the *Slagle* case is not binding but only persuasive authority, to be accepted or rejected or given such weight by this Court as it may determine. The decision in the *Slagle* case is not in accord with the

holding in *Hanly v. Potts,* 52 W. Va. 263, 43 S. E. 218, and this Court is not disposed to accord controlling force or effect to the *Slagle* case in the decision of the case at bar.

As heretofore pointed out the clear and decided preponderance of all the evidence amply supports the contention of the plaintiff that no part of the account is barred by or subject to the application of the statute of limitations. For this reason the verdict of the jury cannot stand. This Court has consistently held that a verdict of a jury, which is without sufficient evidence to support it, or is plainly against the decided weight and preponderance of conflicting evidence, will on proper motion be set aside by the court. *Mulroy v. Co-Operative Transit Company,* 142 W. Va. 165, 95 S. E. 2d 63; *Kap-Tex, Inc. v. Romans,* 136 W. Va. 489, 67 S. E. 2d 847; *Cannaday v. Chestonia,* 106 W. Va. 254, 145 S. E. 390; *Palmer v. Magers,* 85 W. Va. 415, 102 S. E. 100; *Griffith v. American Coal Company,* 78 W. Va. 34, 88 S. E. 595; *Kelley v. Aetna Insurance Company,* 75 W. Va. 637, 84 S. E. 502; *Sims v. Carpenter, Frazier and Company,* 68 W. Va. 223, 69 S. E. 794; *Coalmer v. Barrett,* 61 W. Va. 237, 56 S. E. 385; *Chapman v. Liverpool Salt and Coal Company,* 57 W. Va. 395, 50 S. E. 601.

As previously indicated, the evidence in this case, though in some respects conflicting, embraces uncontradicted facts and circumstances which caused the case to turn in favor of the plaintiff. In numerous cases this Court has held that when the evidence, though conflicting as a whole, embraces uncontradicted facts and circumstances which cause the case to turn in favor of one of the parties so that a verdict adverse to such party can not stand, the court should direct a verdict in his favor. *Mulroy v. Co-Operative Transit Company,* 142 W. Va. 165, 95 S. E. 2d 63; *Adkins v. Aetna Life Insurance Company,* 130 W. Va. 362, 43 S. E. 2d 372; *Norvell v. Kanawha and Michigan Railway Company,* 67 W. Va. 467, 68 S. E. 288, 29 L.R.A., N.S., 325. See *Tochek v. Monongahela Trans-*

*port Company,* 109 W. Va. 20, 152 S. E. 776; *Smith v. Abbott,* 106 W. Va. 119, 145 S. E. 596; *Summit Coal Company v. Raleigh Smokeless Fuel Company,* 99 W. Va. 11, 128 S. E. 298; *Hicks v. New River and Pocahontas Consolidated Coal Company,* 95 W. Va. 17, 120 S. E. 898. See also *England v. Aetna Life Insurance Company,* 285 Mich. 302, 280 N. W. 771.

Inasmuch as the circuit court, upon the evidence as a whole, refused to direct a verdict for the plaintiff for the sum of $272,571.12, it should have granted the motion of the plaintiff to set aside the verdict and award it a new trial.

In this jurisdiction and according to the weight of authority, the burden rests upon the defendant, under its plea of the statute of limitations, to establish by a preponderance of the evidence that the claim of the plaintiff is barred by the statute. *Knight v. Chesapeake Coal Company,* 99 W. Va. 261, 128 S. E. 318; *Buck v. Newberry,* 55 W. Va. 681, 47 S. E. 889; Burke, Pleading and Practice, Fourth Edition, Section 240; 34 Am. Jur., Limitation of Actions, Section 450; 54 C.J.S., Limitations of Action, Section 386. From the evidence as a whole it is clear that the defendant has failed to meet or discharge that essential legal requirement in this case.

As to the manner of the application of payments made by a debtor upon an account the debtor, at the time of making payments, has an absolute right to direct to which of his debts payments shall be applied, but if he omits to exercise such right, the creditor to whom the payments are made may apply such payments as he may choose to apply them; and if an account sued upon contains credits, either in money or other thing, such credits will be applied, in the absence of any special application by the parties themselves, to such portions of the account, if any there be, as would otherwise be barred by the statute of limitations. *Ryan v. Casto,* 76 W. Va. 314, 85 S. E. 553. In general when application of payment is made

by the debtor to an account, consisting of different items of indebtedness, maturing at different times, the payment will be applied to the item first due, and then to the remaining items in order of their due date. *Henderson v. Kessel,* 93 W. Va. 60, 116 S. E. 68. When a debtor in making payments on an account does not direct their application, or there is no agreement between the parties as to how they shall be applied, the creditor may apply such payments in such manner as he may determine. *The Tildesley Coal Company v. American Fuel Corporation,* 130 W. Va. 720, 45 S. E. 2d 750; *Koblegard Company v. Maxwell,* 127 W. Va. 630, 34 S. E. 2d 116; *New River Grocery Company v. Neely,* 106 W. Va. 96, 144 S. E. 874; *Farr v. Weaver,* 84 W. Va. 182, 99 S. E. 395; *Wait v. Homestead Building Association,* 81 W. Va. 702, 95 S. E. 203, 21 A.L.R. 696; *Hanly v. Potts,* 52 W. Va. 263, 43 S. E. 218; *Poling v. Flanagan,* 41 W. Va. 191, 23 S. E. 685; *Buster and Beard v. Holland,* 27 W. Va. 510; *Genin v. Ingersoll,* 11 W. Va. 549; *Chapman v. Commonwealth,* 25 Gratt. 721, 66 Va. 721; *Howard v. McCall,* 21 Gratt. 205, 62 Va. 205; 14 Michie's Jurisprudence, Payment, Section 25; 40 Am. Jur., Payments, Sections 110 and 117. In *Hanly v. Potts,* 52 W. Va. 263, 43 S. E. 218, it was held that the creditor, in the absence of any direction by the debtor as to the application of payments made by him on a running account, had the right to apply such payments as he might elect to any indebtedness owed him by the debtor. In that case this court, quoting from Section 36, page 99, first Barton's Law Practice, said: ''If the account sued upon contains credits, either in money or anything else, or if payments in money or other things shall be proved to have been made, they will be applied, in the absence of any special application by the parties themselves, to such portions of the account, if any there be as would otherwise be barred by the statute.'' The burden rests upon the defendant to prove that it directed the planitiff to apply the payments made by it to particular invoices or portions of the account and that the direction to do so was made known to

the plaintiff. *Stone Company v. Rich,* 160 N. C. 161, 75 S. E. 1077; 70 C.J.S., Payment, Section 97; 40 Am. Jur., Payment, Section 281. The evidence shows clearly that the defendant has failed to satisfy this requirement.

To the contention of the plaintiff that the action of the circuit court in admitting the testimony of Jane Kelly that the account was forgiven or released by the plaintiff by virtue of a verbal statement made to her by Mrs. Greer at a meeting of the directors of the power company on December 16, 1952, and in giving an instruction to the jury based upon such testimony constituted reversible error, the defendant replies in substance that the question of forgiveness was removed from the case and that defense was abandoned by the defendant inasmuch as it did not present that question in its argument to the jury and does not rely upon that defense on this writ of error. That testimony, however, and the instruction based upon it, which, together with the other instructions, at the request of the jury, was read to it a second time by the trial judge, were not stricken or removed but remained in the case and before the jury for its consideration. If the action of the circuit court constituted error it was not corrected, as it could have been, by directing the jury to disregard the evidence and by withdrawing the instruction from the jury. The evidence was inadmissible for the reasons that the purported forgiveness or release was not authorized by any valid corporate action of the plaintiff, as clearly appears from the minutes of the meeting, and was not supported by any sufficient legal consideration. It can not be said that this testimony was not prejudicial to the plaintiff. On the contrary any statement to the effect that the account had been forgiven or released could readily induce the jury to disallow the large portion of the account which existed when the statement was made in December 1952 or to reduce the unpaid amount of the plaintiff's account, as it did by its verdict, to the relatively insignificant sum of

$1304.43. This Court has held in numerous cases that the admission of incompetent evidence is presumed to be prejudicial and is cause for reversal unless it appears that the verdict of the jury could not have been influenced by it. *Slater v. United Fuel Gas Company,* 126 W. Va. 127, 27 S. E. 2d 436; *Mitchell v. Metropolitan Life Insurance Company,* 124 W. Va. 20, 18 S. E. 2d 803; *State v. Stone,* 100 W. Va. 150, 130 S. E. 124; *Alford v. Kanawha and West Virginia Railroad Company,* 84 W. Va. 570, 100 S. E. 402; *State v. Tygart Valley Brewing Company,* 74 W. Va. 232, 81 S. E. 974; *Ewers v. Montgomery,* 68 W. Va. 453, 69 S. E. 907; *State v. Hull,* 45 W. Va. 767, 32 S. E. 240; *State v. Musgrave,* 43 W. Va. 672, 28 S. E. 813. It can not be said that without the improper evidence the jury would not have allowed the full amount of the account or a substantially larger amount than it did allow or that such evidence did not influence the jury in arriving at its verdict for $1304.43. In *Wheeling Mold and Foundry Company v. Wheeling Steel and Iron Company,* 62 W. Va. 288, 57 S.E. 826, this Court used this language concerning the admission of incompetent evidence: "* * * we can not say what effect such illegal evidence had upon the mind of the jury; and the rule is that, unless it clearly appears that the objecting party was not prejudiced by the illegal evidence, the verdict should be set aside. *Dent v. Pickens,* 34 W. Va. 240. If it may have prejudiced the exceptor, though it be doubtful whether it did or not, it will be cause for reversal of the judgment. *Poindexter v. Davis,* 6 Grat. 481; *Insurance Co. v. Trear,* 29 Gratt. 259; *State v. Kinney,* 26 W. Va. 141; *Taylor v. Railroad Co.,* 33 W. Va. 39; *Webb v. Big Kanawha Co.,* 43 W. Va. 800."

It was also error for the circuit court to give Instruction No. 6 offered by the plaintiff as modified by the circuit court relating to the alleged forgiveness or release of the account for the reason that the instruction, as modified, omitted the essential requirement that an unsealed release of an obligation to be

valid must be based upon a consideration deemed valuable in law. *Clark v. Sperry,* 125 W. Va. 718, 25 S. E. 2d 870; *Bays v. Johnson,* 80 W. Va. 559, 92 S. E. 792; *Charleston Lumber Company v. Friedman,* 64 W. Va. 151, 61 S. E. 815; *McConnell and Drummond v. Hewes,* 50 W. Va. 33, 40 S. E. 436. The instruction was erroneous in that it did not correctly propound the law and for that reason tended to mislead and confuse the jury. An instruction which does not correctly state the law is erroneous. *Overton v. Fields,* 145 W. Va. 797, 117 S. E. 2d 598; *Hartley v. Crede,* 140 W. Va. 133, 82 S. E. 2d 672; *Matthews v. Cumberland and Allegheny Gas Company,* 138 W. Va. 639, 77 S. E. 2d 180; *Wilson v. Edwards,* 138 W. Va. 613, 77 S. E. 2d 164; *Thrasher v. Amere Gas Utilities Company,* 138 W. Va. 166, 75 S. E. 2d 376; *Moore v. Turner,* 137 W. Va. 299, 71 S. E. 2d 342, 32 A.L.R. 2d 713; *Thomason and Beggs v. Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699; *Gilkerson v. Baltimore and Ohio Railroad Company,* 129 W. Va. 649, 41 S. E. 2d 188; *Parrish v. City of Huntington,* 57 W. Va. 286, 50 S. E. 416. It is reversible error to give an instruction which tends to mislead and confuse the jury. *Overton v. Fields,* 145 W. Va. 797, 117 S. E. 2d 598; *Hartley v. Crede,* 140 W. Va. 133, 82 S. E. 2d 672; *Matthews v. Cumberland and Allegheny Gas Company,* 138 W. Va. 639, 77 S. E. 2d 180; *Chaney v. Moore,* 101 W. Va. 621, 134 S. E. 204, 47 A.L.R. 800; *Frank v. Monongahela Valley Traction Company,* 75 W. Va. 364, 83 S. E. 1009. An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not injured by the giving of such instruction. *Overton v. Fields,* 145 W. Va. 797, 117 S. E. 2d 598; *Cato v. Silling,* 137 W. Va. 694, 73 S. E. 2d 731, certiorari denied, 348 U. S. 981, 75 S. Ct. 572, 99 L. Ed. 764, rehearing denied, 349 U. S. 924, 75 S. Ct. 659, 99 L. Ed. 1256; *Buffington v. Lyons,* 71 W. Va. 114, 76 S. E. 129; *Ward v. Brown,* 53 W. Va. 227, 44 S. E. 488.

In view of the pronouncements in this opinion with respect to the questions specifically dealt with and

determined it is unnecessary to discuss or consider other contentions of the plaintiff in support of its assignment of errors.

The judgment of the Circuit Court of Preston County is reversed, the verdict is set aside, and this case is remanded for a new trial which is here awarded the plaintiff.

*Judgment reversed,*
*verdict set aside,*
*new trial awarded.*

GIVEN, JUDGE, dissenting:

Being of the firm view that the controlling question, the question relating to the application of the statute of limitations, was unquestionably for jury determination, and that the experienced and learned trial judge properly submitted that question to the jury, I am forced to dissent. It is of interest to note that the majority admits that there is a conflict in the evidence, and though the majority now says that the verdict was contrary to the "clear and decided" preponderance of the evidence, it did not seem so when the re-argument was ordered, on the very same record. Moreover, in the study of the evidence, and in the decision conferences of this Court, the view of the majority members of the Court, on the very same question, was not always the same, yet the majority points out that ordinarily the question here involved is one for jury determination.

I do not doubt the power or duty of this Court to set aside a verdict which is against a clear preponderance of the evidence, but it is just as clear that every reasonable inference warranted by the evidence should be considered in support of a verdict. In other words, the jury is the proper body to weigh the evidence and draw inferences.

In considering the cogency or probative value of the evidence as to either party, it is necessary to keep in mind certain basic facts not disputed. The plaintiff's account of its indebtedness, filed with its declara-

tion, showed an undisputed balance of $272,571.12, which amounted to only a part of the charges as to the transactions for the five year period immediately before the date of the institution of the action, April 22, 1958. During that five year period there were sixty payments, usually referred to as monthly payments, equaling to the very cent the entire total of all net charges made against the defendant during the sixty months, less the amount of the jury verdict, $1,304.43. In no possible manner could the jury have arrived at that exact amount except on the theory that the monthly settlements and payments were understood and intended by the plaintiff and the defendant to be in satisfaction of the monthly net balances. It may also be noted that the amount of plaintiff's claim, $272,571.12, was a balance which existed, and was reflected by the books of account of both parties, for years prior to the beginning of the five year period, and that it never varied except as affected by the monthly charges or payments. There may be a further exception as to the transactions for April, May and June, 1953, when defendant was unable to make regular monthly payments, which is fully explained by the evidence, but even for those three months, when payment on the charges for such three months was resumed, the payments were in round, even figures, not in odd dollars and cents.

It should also be noted that during the five year period, the monthly charges made by defendant against the plaintiff were paid to defendant each month, to the very cent, either by check or by deduction from the larger amount owed plaintiff by the defendant. Thus, hundreds of items of charges, both as to plaintiff and defendant, to the very cent, were settled, satisfied and paid monthly. Can we believe that if there had been no such understanding as to the application of payments, as contended for by defendant, that the plaintiff would have continued to make regular monthly payments to defendant of the charges made by the defendant against plaintiff? It is also

significant that the net monthly balances were paid by defendant, and accepted by plaintiff, to the odd dollar and cent. Certainly no one could contend, with much force, that sixty consecutive payments, covering sixty consecutive monthly settlements, to the very cent in each case, could not have been intended and accepted as payment for such specific monthly settlements. In fact, that very pattern of the method of settlement and payment existed long before the commencement of the five year period, as pointed out by the majority. Moreover, when the attention of the president of the plaintiff company was directed to the fact that when partial payments on the account were made, long before the commencement of the five year period, and for the three unpaid monthly accounts mentioned above, they were always in "round figures", such as $10,000, $1,000, $8,000, $2,000, $4,000 and $3,000 and, when requested to explain why such method of payments differed as to odd dollars and cents, answered: "I have no explanation for that". And the plaintiff's witness Moore, treasurer and general manager of the plaintiff company, was asked the following question, "It would be unusual would it not, to pay odd cents and odd dollars if it were not meant to cover a particular statement or invoice?" to which he answered, "I would say it would be".

Looking to the whole of plaintiff's evidence, as to its cogency and probative value as related to the particular problem, five witnesses testified in chief. Three of them gave no testimony concerning the question here involved, except as it related to the manner or method of bookkeeping. The other two, in addition to their testimony relating to the method of bookkeeping, were more emphatic as to the intention of plaintiff to apply the monthly settlement-payments to the older part of the account. None of the witnesses, however, contended that any specific requirement or instruction to that effect was ever made by the officers of the plaintiff company, or that any such instruction existed. It is admitted by the witnesses for plain-

tiff that no request or demand for even a partial payment of the old account was made until after the family difficulty between Mrs. Greer and her daughter, Mrs. Kelly, arose. That difficulty, and its implications, seem to be sufficiently reflected by the statement contained in the letter to Jane G. Kelly, president of the defendant company, by Mrs. Greer as vice president of the plaintiff company, dated September 13, 1957, wherein it is stated: "Inasmuch as our proposal was for the acquisition of stock controlling your company and was not for the acquisition of the assets of your company, we have no proposal to make to your Board of Directors. We are, however, directing a purchase proposal to you personally.

"If we are unable to acquire control of your company and bring about a unification of management and resources, we shall be forced to choose from two alternative courses of action." The alternatives were either that the defendant should accept the proposal of plaintiff concerning an increase in rates or charges for power sold by it to defendant, so that plaintiff would not "be forced to proceed with collection of the $272,571.12 account receivable due from the Light & Power Company. Prompt court action of this matter is particularly desirable to the Coke Company since even in the unlikely event of an adverse decision it would have the tax advantage of an established loss while the Light & Power Company would have an empty victory and incur an income tax liability of $141,736.98; a debt which could crush that company", or, the other alternative, "cease all expansion work", thereby forcing defendant to purchase power from a different company at a rate considered prohibitive. Again the written statement of plaintiff recognized the $272,571.12 as an old account carried on the books of the two companies as something wholly different from the monthly settlements and payments, and also that defendant was denying liability in relation thereto.

While I believe the whole evidence of the plaintiff, considering the inferences the jury would have

been warranted in drawing therefrom, was sufficient to go to the jury, I most certainly do not believe it to be conclusive, or even strongly supporting plaintiff's theory. Stripped of the method of plaintiff's bookkeeping little, if anything, is left to support a verdict for plaintiff. I think it not necessary to cite any authority to the effect that the mere method of bookkeeping does not conclusively establish intention of the parties as to how payments on any account, whether a running, open or monthly account, should be allocated, or that allocation of payments may be directed by the payer by implication. The majority, apparently, concedes that much. See, however, *Ryan, Special Receiver v. Casto,* 76 W. Va. 314, 85 S. E. 553; *Chapman v. Commonwealth,* 25 Gratt. 721.

In addition to the foregoing facts, especially the uniform pattern of the monthly settlement and payment for the entire five year period, and long before, other pertinent and strong testimony exists supporting the verdict of the jury. Mr. Crane, vice president of the defendant company and the only person authorized to sign checks for it, testified: "I can speak from the period from August, 1953, on in which I either made up the checks personally or gave directions to one of the girls in the office to make them up to which they were intended to pay a specific month's invoice, or invoices, and they were always made exactly to the penny. Q. Mr. Crane, does your answer to that question cover also the checks and invoices embraced in Defendant's Exhibit No. 3? A. They do." Mr. Crane further testified positively that the sum claimed, $272,571.12, "represents an amount that had been accumulated on our books prior to the time I went with the company", 1953, and that no "express demand" other than the one made just before institution of the action was ever made of the defendant for payment of any part of the old account.

In a letter from plaintiff to defendant dated September 16, 1955, the plaintiff said: "Your accounts are in pretty good shape now and if your collections

come in as they have been in the past you should have no trouble in meeting your monthly account''. Thus, the plaintiff clearly and definitely, the second time, in writing recognizes the monthly account settlement and payment pattern, contended for by defendant and found by the jury to have existed.

Honig, an experienced certified public accountant, engaged in the business since 1928, made a thorough examination of the account books of defendant and plaintiff, especially as to the claim here involved. From his testimony, not denied, it appears that during the five year period here material, the amount of the monthly invoices of defendant, plus the amount of payments to plaintiff as represented by defendant's cancelled checks, was ''equal to the penny'' to the exact amount of the payments made by defendant. He also testified as to a notation on the ledger of plaintiff in connection with the credit of the November, 1953, charge, in handwriting, saying, ''paid on November account'', which unquestionably constituted a recognition by plaintiff of a monthly account, and of the payment of that monthly account. The witness further testified to the effect that such a memorandum was not necessary as to subsequent monthly payments, for the reason that, as a matter of bookkeeping, such fact ''was obvious''. Also, the November, 1953, worksheet of defendant showed a ''Bal due Coke Co. Nov. 3,365.30''; and a cancelled check for that exact amount was exhibited to the jury, indicating the pattern of monthly settlement and payment of monthly accounts.

Beginning long before the commencement of the five year period, at least by March, 1951, and continuing through the period in which the monthly charges made by defendant against plaintiff were deducted from the monthly charges made each month by the plaintiff against the defendant, each individual monthly statement or invoice received from plaintiff by defendant, or defendant's worksheet for that particular month attached to such monthly statement, was marked ''paid'', with the further notation,

"Balance due Coke Company", "balance due Coke Company Nov.", "Balance due Coke Company Dec", "Total amount due Coke Company", or "Balance", together with the date of payment, and, usually, with the number of the check by which the specific monthly statement was paid. In every such instance there were exhibited to the jury individual monthly statements, with such notations thereon, together with cancelled checks to the exact cent, constituting payment for each particular monthly statement. Subsequent to that period, and during the remaining part of the five year period, the account books of defendant showed separately and distinctly the charge and credit of every particular monthly charge or settlement, and separate checks, for each separate month's settlement, showing full payment to the plaintiff for each such month, were exhibited to the jury. Also, separate checks during the latter part of the five year period were executed by plaintiff and delivered to defendant for each month's charges against plaintiff. The only possible answer to the conclusive effect of such cogent proof would be that plaintiff had no knowledge of the notations or pattern of settlement and payment. But is such an answer reasonable, in view of the indisputable fact, pointed out by the majority, that certain individuals were officers, in managing authority, of the plaintiff company and of the defendant company, and of the further admitted fact that every such monthly settlement, and payment therefor, was accepted and acted on by the plaintiff? At least, would such question not be one for jury determination?

Mrs. Kelly testified as to various conversations with Mrs. Greer and other officers of the plaintiff company, and stated that it was her understanding that the old account was being carried on the books "and should remain on the books only in some reference to some tax difficulties we would get in if it were removed * * *". She further testified that she had a conversation with the treasurer and general manager of the plaintiff company, who desired an exchange of

balance sheets, and that she informed him that the defendant company would not agree to such exchange if the exchange involved any recognition of the old debt and, when asked if he so agreed, testified: "He must have agreed because we did exchange the Balance Sheets". As pointed out by the majority, the statement was denied by the general manager, but, in my view, the credibility of the witnesses was a matter for the jury. If the testimony is true it constituted solid proof of the fact that the only reason the old claim remained on the account books of the parties was in connection with tax liabilities.

Mrs. Kelly also testified to the effect that Mrs. Greer agreed to release or cancel the entire old account. Though, as pointed out by the majority, there was probably lack of sufficient consideration for such cancellation, the testimony most certainly had probative value as to the reason for the carrying of the old debt on the books for so many years, without any demand for even a partial payment thereon.

In *F. M. Slagle & Co. v. Bushnell,* 70 S. D. 250, 16 N. W. 2d 914, a case in point factually, though the facts proved or admitted in the instant case are much stronger, it was held: "19. Evidence established that payments by check in small amounts, most of which exactly matched current purchases, were intended as in payment of particular items of indebtedness and not as payment on general balance of account and that such intention was manifest to creditor so that such payments did not interrupt running of six year statute of limitations as to balance of account. 20. A person owing money under distinct contracts may apply payments to whichever debt he may choose and direction as to application of payment may be evidenced by circumstances as well as by words. 21. Payments were earmarked as specific rather than general payments on balance of account by fact that they were made by checks drawn in comparatively small odd dollar and cent amounts, and hence appropriation by debtor of such payments to particular items resulted

as a matter of law." Though the Court, in the cited case, held the pattern of payment, "as a matter of law", established direction by the payer as to the manner of application of such payments, in the instant case the majority holds the question is not even for jury consideration. For other authorities supporting the *Bushnell* holdings, see *Hawley v. Little Falls Mill & Mercantile Co.,* 220 Minn. 165, 19 N. W. 2d 161; *Farbstein v. Eichmann,* 23 N. J. Super. 484, 93 A. 2d 414; *St. Joseph & G. I. Ry. Co. v. Elwood Grain Co.,* 199 Mo. App. 432, 203 S. W. 680; *Caffarelli Bros. v. Lyons Bros. Co.* (Tex.), 199 S. W. 685; *Spencer v. Sowers,* 118 Kansas 259, 234 P. 972.

Being of the views indicated, I respectfully dissent. As definitely appears from the testimony of defendant, quoted above, and from undisputed facts pointed out, the verdict of the jury on which the judgment of the lower court was founded, was not only warranted but was the only verdict that could be justified.